**Ivie CLAY, Plaintiff,**

v.

**James DOHERTY, et al., Defendants.**

**No. 81 C 1860.**

United States District Court,
N.D. Illinois, E.D.

April 16, 1985.

Roger Pascal, Schiff, Hardin & Waite, Barbara Hermansen, Chicago, Ill., for plaintiff.

Thomas Foran, Foran, Wiss & Schultz, Christine McGoey, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Ivie Clay ("Clay") has sued supervisors James Doherty ("Doherty") and Ronald Katz ("Katz") in the Cook County Office of the Public Defender, Cook County Chief Guardian Ad Litem Leonard Goodman

("Goodman") and the County of Cook ("County") itself under 42 U.S.C. § 1983 ("Section 1983"), seeking to recover damages stemming from the allegedly incompetent representation provided Clay in a juvenile criminal proceeding. Both Clay and defendants have now filed disqualification motions:

1. Defendants urge this Court to recuse itself under 28 U.S.C. § 455(a) ("Section 455(a)") on account of its acquaintance with Saul Friedman ("Friedman"), a key non-party witness.

2. Clay seeks disqualification of defendants' counsel, Foran, Wiss & Schultz ("Foran," treated in this opinion—to avoid awkwardness in language—as a singular masculine noun rather than a collective firm name) on the ground Foran's joint representation of all the defendants entails clear conflicts of interest, inconsistent with an attorney's responsibilities under American Bar Association ("ABA") Code of Professional Responsibility ("Code") Canons 4 and 5 and the Disciplinary Rules ("DRs") under those Canons.

For the reasons stated in this memorandum opinion and order, both motions are denied.

*Background*

It is hardly surprising that four-year-old litigation stemming from eight-year-old events should have a complicated factual and procedural background. For present purposes, however, a relatively brief summary will suffice.

In 1977 Friedman, an Assistant Public Defender in the juvenile division, was appointed to represent Clay after her arrest for aggravated assault on Jose Garcia, whom she had caught climbing through the window of the vacant apartment below hers. On Friedman's advice Clay pleaded guilty to the charges, believing (on Friedman's representation) she would be sentenced to nothing more than probation or supervision. Instead she was committed for custody to the Illinois Department of Corrections. Friedman then filed a form motion to vacate, outlining no specific basis

for relief. At the hearing on the motion, Clay was represented by Roger Harris ("Harris"), another Assistant Public Defender, who was unfamiliar with Clay's case and made no argument. Clay's motion to vacate was denied in February 1978.

In early March 1978 Northwestern University Legal Clinic's Assistant Director John Elson ("Elson") took over Clay's representation. Elson filed an amended motion to vacate, in part urging ineffective assistance of counsel in connection with the Friedman motion. Elson's motion was denied because it was untimely and because the issues it raised could have been raised in the first motion to vacate. Elson did not appeal that ruling but rather sought collateral review by means of a federal habeas petition filed in April 1979. That action is still pending, with new counsel acting in place of Elson. *See Clay v. Director, Juvenile Division, Department of Corrections,* 749 F.2d 427, 433 (7th Cir.1984).

Two years later Clay (through Elson as her counsel) filed this Section 1983 action, including Friedman and Harris as defendants. This Court dismissed the Section 1983 claims against Friedman and Harris (as well as various pendent state claims) on the authority of *Polk County v. Dodson,* 454 U.S. 312, 319–25, 102 S.Ct. 445, 450–53, 70 L.Ed.2d 509 (1981) (*see Clay v. Friedman,* 537 F.Supp. 409 (N.D.Ill.1982)), and Clay then filed a common law malpractice action against both public defenders in state court. As against the remaining defendants here:

1. Clay has alleged Doherty, Katz and Goodman caused violations of her constitutional rights by their inadequate training and supervision of Friedman and Harris.

2. Clay seeks to hold County liable under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978).

3. Clay has also asserted state law tort claims against all four defendants.

Until July 1984 the Cook County State's Attorney's Office ("State's Attorney") rep-

resented all defendants in this Section 1983 action and also represented Friedman and Harris in the state court malpractice suit. In late June, however, Assistant State's Attorney David Allen ("Allen") moved to withdraw as counsel for defendants in both actions, stating the Public Defender's Office had asked the State's Attorney to seek contribution from Elson for his participation in Clay's defense. It was the position of the Public Defender's Office that had Elson filed an appeal from the denial of his amended motion to vacate, that appeal would have been successful and the damage to Clay much reduced. Allen Aff. 1–2 said filing such a contribution action would have presented a clear conflict of interest for the State's Attorney:

> [A]s the agency which prosecuted Ms. Clay, and would have urged the Appellate Court to affirm her conviction, [the State's Attorney] cannot now ask that her appeal would have been successful and her conviction reversed.

This Court granted the State's Attorney's motion to withdraw in this action. Foran, designated as a special State's Attorney for the purpose, assumed the representation of defendants both here and in the state court lawsuit. Elson has since withdrawn as counsel for Clay, who is now represented by court-appointed counsel.

### Section 455(a) Motion

Though Friedman is no longer a defendant in Clay's Section 1983 suit, he clearly remains a key witness: His representation of Clay in the juvenile criminal proceeding forms the basis of her claims against Doherty, Katz and County. Because lawyer substitutions have entirely changed the original cast of characters, this Court therefore thought it appropriate to repeat, at a December 28, 1984 status conference, a disclosure made when the case first arose—this Court's social acquaintance with Friedman and his wife (Tr. 2–3):

> As I understand it, Mr. Friedman's wife has been a friend since high school days of two women who have been friends with my wife since college days, and as a result we have, although we have never been the Friedman's guests, nor have they been ours, we have seen them sporadically over the last maybe 20 years or so.
>
> For example, I remember when the daughter of one of these ladies, close friend of my wife's, was married we ended up seated at the same table for dinner, and there have been other comparable social occasions on which we have seen them.
>
> I must tell you, just to show the level of my ignorance, I knew of him, Mr. Friedman, not as a lawyer but as a business partner of his wife's brother, which I guess he was for a long time before he must have gone back into the practice.
>
> In any event, I wanted to let everybody know up front. I have not found that as inhibiting my actions here because I don't have any kind of stake in him or vice versa. I wanted the parties to know because he has, again, I see become a very active player.

On the basis of that statement, defendants later moved to disqualify this Court under Section 455(a).

Section 455(a) reads in its entirety: Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

In an effort to assure public confidence in the impartiality of judicial proceedings, yet without granting litigants an effective veto over the assignment of judges, Section 455(a) establishes an objective rather than subjective standard for disqualification. *In re United States*, 666 F.2d 690, 695 (1st Cir.1981) (citations omitted, emphasis in original) explains:

> [D]isqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality. Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of fac-

tual bases for bias.... This restricted mandate to disqualify is calculated to induce a judge to tread the narrow path between timidity and tenacity.

■■■ As this Court has noted in *M.K. Metals, Inc. v. National Steel Corp.*, 593 F.Supp. 991, 993 (N.D.Ill.1984), a judge's self-appraisal that he or she is able to preside impartially over the case is irrelevant to the Section 455(a) balance. On the other side of the coin, the party urging recusal has the burden of producing facts sufficient to raise doubts in the mind of a detached and reasonable observer. How those (or other) facts may impact on the inevitably partial estimate of the moving party is quite beside the point.

Defendants have sought to meet their burden with an obvious (but also obviously tenuous) argument:

1. Even though this case is to be tried to a jury, the presiding judge may be required to make rulings that in one way or another hinge on an evaluation of Friedman's competence and credibility as a witness.

2. Because this Court has a prior acquaintanceship with Friedman, it is likely any such rulings will be influenced, at least to a degree, by impressions of Friedman formed on the basis of extrajudicial encounters.

As defendants put it (Mem. 7):

It would not be unreasonable to assume that since Friedman and the Court have shared mutual and close friends for the last twenty years and have socialized throughout that time, this Court has developed some feeling toward Friedman and some opinion of him. In fact, it would be unnatural for the Court to have done otherwise.

That argument's appeal to presumed human nature both overstates this Court's link with Friedman[1] and underestimates the capacity—which must fairly be ascribed to every judge—to remain impartial notwithstanding wide-ranging extrajudicial knowledge and impressions. Plainly the longer a judge lives in a community the larger the body of knowledge, acquaintance and experience he or she carries onto the bench each day. There can be no denying every judge forms impressions based on such things as having read articles in a newspaper, having acted as counsel opposing a lawyer who now has a case before him or her, or having met and talked with an acquaintance at a reception, wedding or conference, or on a train or bus. Yet no reasonable person can doubt the judge's ability to decide the questions he or she confronts in a given case independently of such casual impressions. Only when the extrajudicial associations are in the broadest sense intimate—family relationships and friendships—or when they are substantially linked with financial or professional interest, or when they afford prior knowledge of facts that weigh heavily in the case, do reasonable people begin to doubt the judge's capacity to maintain the separation between judicial and extrajudicial knowledge.

■ Indeed were the threshold for recusal under Section 455(a) any lower, the very purpose of the provision—to foster public confidence in the impartiality of judicial proceedings—would be jeopardized. Such confidence is as much sustained by conduct indicating a judge's ability to proceed impartially, notwithstanding casual prior acquaintance or knowledge, as by withdrawal from cases in which his or her ability to make independent judgments is open to reasonable doubt. Any habit of too ready recusal would foster at best the impression of a timid judiciary and at worst cynicism

1. In the course of their original briefing, defendants actually misquoted this Court's December 28 statement (though they had the court reporter's written-up transcript) so as to reflect a longstanding close friendship between Friedman's wife and this Court's own wife (Def. Mem. 2). Though this Court's oral statement (as is all too often true of unrehearsed remarks from the bench) could have been better structured, it clearly disclosed a very different situation—one in which the two women had friends in common, rather than being close friends of each other. In mathematical terms, the true picture is that of circles comprising two separate sets (the friends of each woman) intersecting at just two points (the common friends).

about its fundamental capacity for impartiality. In either instance the result must be a diminution of public confidence in the courts. It is no accident that this District Court's reputation for integrity exists in the context of an unimpeachable and firmly-adhered-to random-case-assignment system.

■ Those principles, applied to the circumstances of this case, mandate denial of defendants' Section 455(a) motion.. As the December 28 disclosure made plain, Friedman is simply an acquaintance of this Court. Encounters over the years have been sporadic and not of the nature to produce even a single occasion at which either has been a guest at the other's home. Given so attenuated a relationship, it is simply implausible that a reasonable observer would doubt this Court's ability to pass impartially upon any questions for the court (as opposed to the jury) raised by Friedman's testimony. And that conclusion is only strengthened by the fact Friedman is merely a witness in this case, not a party. In short, were this Court to recuse itself in this case, it would effectively read the qualifying adverb "reasonably" out of Section 455(a).[2]

### Motion To Disqualify Foran

At the time the State's Attorney withdrew as counsel for defendants in this case and in the state court malpractice action, Clay's counsel expressed the view that the interests of the various defendants—particularly as between the individual defendants and County—were not consistent. For that reason, counsel suggested that representation of all defendants by the same lawyers would create conflicts of interest at odds with a lawyer's ethical responsibility of loyalty to his clients. Clay renewed her objections on several occasions: when Foran

first filed appearances in the case, then during two status conferences in the latter half of 1984, and also in two letters to Foran, one dated October 12 and the other December 11, 1984.

At a November 7 status conference Foran indicated his intention to withdraw as counsel for Goodman because Goodman (1) had grounds, distinct from those available to the other defendants, to argue for dismissal from this suit and (2) was considering asserting claims of his own against Doherty. While it remains unclear whether new counsel has assumed Goodman's defense, it does appear Foran has withdrawn. Foran, however, has taken no steps as to the other defendants on the grounds that he perceives no conflict warranting withdrawal. Accordingly Clay filed her motion to disqualify Foran on December 28.

Clay's motion is founded on *Dunton v. County of Suffolk*, 729 F.2d 903, 907–10, *modified on other grounds*, 748 F.2d 69 (2d Cir.1984), which reversed a judgment for plaintiff on a Section 1983 claim because defendants—an individual police officer and the municipality that employed him—had been defended by the same counsel despite their divergent interests. As *Dunton* explained (*id.* at 907):

> A municipality may avoid liability by showing that the employee was not acting within the scope of his official duties, because his unofficial actions would not be pursuant to municipal policy. The employee, by contrast, may partially or completely avoid liability by showing that he was acting within the scope of his official duties.

Here, as Clay acknowledges, no one disputes the individual defendants acted within the scope of their official duties. Nevertheless she claims there is a divergence of

---

**2.** Though this ruling is not predicated on waiver grounds, it may also be that defendants have waived their right to move for recusal under Section 455(a). Section 455(e) provides in relevant part:

> Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full

disclosure on the record of the basis for disqualification.

Such disclosure was made early on in this case, and defendants did not then seek this Court's recusal. It is by no means obvious that the change in counsel on both sides of the case is sufficient reason to give either side a second bite.

interests among the defendants, no different in effect from that in *Dunton.* Clay argues:

1. County's potential liability is not predicated solely upon proof Katz and Doherty acted within the scope of their official duties pursuant to County policy or practice, *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36. County may also be directly liable if it systematically underfunded the Public Defender's Office and made it impossible for Katz and Doherty adequately to fulfill their responsibility to hire, train and supervise their staff. Any claim by Katz and Doherty that they lacked the funds to fulfill their constitutional duties would be directly at odds with County's interest in claiming it had provided adequate funding.

2. Katz and Doherty may be able to claim a qualified good faith immunity from liability to Clay for their conduct as supervisors. But under *Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980) Katz's and Doherty's immunity will not shield County from liability. If individual defendants choose to rely on a good faith immunity defense, they will have effectively acknowledged the inefficacy of a defense on the merits, thus assuming a position in direct conflict with the one County must assume.

3. Doherty, Katz and Friedman have provided significantly different accounts of events bearing on (a) the quality of the representation Clay was afforded by the Public Defender's Office in the criminal prosecution against her and (b) the allocation of blame as among the three of them for inadequacy in that representation. Those differences create the possibility of inconsistent defenses and breaches of confidence.

Should the case go forward in the face of those conflicts and should Clay win a verdict, she claims she will run the risk that our Court of Appeals, like the Second Circuit, will order a new trial on a finding that one or another of the defendants was inadequately represented. She should not, she urges, be forced to take that risk.

Defendants respond with three grounds for denial of their new counsel's disqualification:

1. Clay has identified no *actual* conflict of interest, but simply the potential always present in a case where multiple defendants are represented by the same attorney.

2. Defense counsel's representation to this Court that defendants have agreed to a common defense merits deference, especially in the face of conflicts that are at best hypothetical.

3. Defendants have consented to common representation following full disclosure of the advantages and disadvantages such representation entails in the circumstances of this case.

With the battle lines thus drawn, this opinion will deal first with the relevant standards and then with their application to this case.

### 1. *Applicable Ethical Rules*

This District Court's General Rule 3.54(B), adopted in the exercise of the Court's inherent authority to regulate practice before it (see *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 710 (7th Cir. 1976)), establishes the Code as the standard applicable to lawyer *discipline.* Although that would not necessarily make the Code the benchmark for lawyer *disqualification* as well, courts have consistently treated it that way.[3]

Code Canon 5 and its DRs address the conflict of interest problems raised on the

---

**3.** After several years of study and discussion, in 1983 the ABA approved Model Rules of Professional Conduct ("Model Rules") to supplant the Code. This District Court has not yet considered whether its own General Rule 3.54(B) should be amended to look to the new standards (perhaps not surprising, given the fact the General Rules had continued to refer to the old ABA Canons of Ethics for some years after they had been superseded by the Code and adopted in almost all the states, including Illinois). In any case, as the text discussion will reflect, the result would be the same under the Model Rules as under the Code.

current motion. DR 5–105 provides in relevant part:

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

■■■■ Representation of multiple parties in litigation is thus not prohibited per se, though there may be classes of cases where the likelihood of adverse effect under DR 5–105(B) is so powerful as to justify automatic prohibition. See *Dunton*, 729 F.2d at 907–08. But in any event, a lawyer who has undertaken multiple representation must remain constantly alert to the possibility of conflicts warranting withdrawal. Moreover the lawyer's own subjective assessment of his or her clients' interests is irrelevant. DR 5–105(B)'s "likely to be adversely affected" standard is an objective one, demanding withdrawal in cases in which a reasonable observer would conclude a likelihood of adverse ef-

fect exists.[4] Nor will a client's consent to the representation automatically justify the lawyer's maintenance of the employment. Under DR 5–105(C) consent after full disclosure cures the conflict of interest problem only if it is also "obvious that [the lawyer] can adequately represent the interest of each" client. If a reasonable observer perceives a likelihood of adverse effect under DR 5–105(B), then, by definition, the "obviously adequate" prong of the DR 5–105(C) test cannot be satisfied.[5]

■■■■ It is worth noting the reasonable observer in the present context is akin to the reasonable observer under Section 455(a)—an *informed* observer. That means someone who at once appreciates the importance of a party's right to be represented by counsel of his or her choice and the ability of a lawyer to keep clearly in focus the interests of clients whose circumstances are not identical. By that standard the "obviously adequate" provision of DR 5–105(C) does not rule out multiple representation whenever there is a hint of conflict, but only in cases where the divergence of interest is actual rather than potential.

■■■■ Code Canon 4 and DR 4–101, prohibiting the disclosure of client confidences and secrets, also bear on multiple representation situations. Where a lawyer represents clients with conflicting interests in an action or actions arising from a common nucleus of operative fact, that necessarily

---

**4.** That the applicable test is an objective one is made clear in the corresponding provision in Model Rule 1.7 (emphasis added):

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer *reasonably* believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer *reasonably* believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

**5.** Under the Code the "it is obvious" language established an independent third condition, over and above the requirements of full disclosure and consent. Shadur, *Lawyers' Conflicts of Interest: An Overview*, 58 Chi.B.Rec. 190, 192 (1977). Model Rule 1.7 deliberately changed that locution but retained the objective standard by stating the matter in terms of the lawyer's "reasonable" belief. See ABA, *Annotated Model Rules of Professional Conduct* 76–77, 79 (1984).

increases the risk that the confidences or secrets of a client may be revealed to third parties or otherwise used to the client's disadvantage. DR 4–101 thus overlaps DR 5–105 in policing the difficulties raised by multiple representation.

2. *Defendants' Arguments Against Disqualification*

Consistently with the principles just outlined, defendants do not deny conflicts such as those identified by Clay might warrant withdrawal *if they were actual.* Rather defendants say there is no indication (let alone any evidence), in the circumstances here, that those conflicts will ever materialize in such a way as to trigger the prohibitions embodied in DR 5–105 and DR 4–101.

 There is always the *potential* for conflict in multiple representation cases. Without more, however, that potential is insufficient to compel withdrawal or disqualification. See *Kerry Coal Co. v. United Mine Workers,* 470 F.Supp. 1032, 1036 (W.D.Pa.1979). Vague and general inconsistencies of position giving rise to hypothetical conflicts in the mind of an opposing party will not justify so drastic a measure as disqualification. *Halperin v. Kissinger,* 542 F.Supp. 829, 831–32 (D.C.D.C.1982); see *Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir.1983) (quoting and following *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir. 1982) for the proposition "that disqualification is a 'drastic measure which courts should hesitate to impose except when absolutely necessary.' "). *Kerry,* 470 F.Supp. at 1036 put it this way:

> Nearly every case, criminal or civil, which involves more than one defendant presents the opportunity to each defendant to attempt to exculpate himself from liability or guilt by blaming any wrongdoing on the other defendant. But even where this possibility is especially apparent because of the differing circumstanc-

es of the defendants' involvement, courts have not necessarily held joint representation improper.

 As Clay's submission on the present motion ably demonstrates, this is a case in which the possibility of conflict is readily apparent. But as defendants' response reflects, as yet none of those conflicts has emerged in any concrete form. Doherty and Katz might perhaps, as the case proceeds, decide to defend themselves by arguing that any shortcomings in their operation of the Public Defender's Office were attributable to inadequate funding. But they have yet to mount that argument, nor have they given any indication they intend to do so. Discovery to date has uncovered some evidence to support such a claim, but it has also uncovered evidence weighing against such a claim. It is inappropriate to allow Clay to force her own theory of their case on Doherty and Katz via a disqualification motion.

Apart from the potential conflicts between the individual defendants and County, Clay points as well to evidence suggesting differences in position among Doherty, Katz and Friedman. For example, while both Doherty and Katz have asserted training programs exist for lawyers in the Public Defender's Office, Friedman's deposition testimony indicated no such training had been available to him.[6] More significantly, Doherty and Katz have both indicated procedures existed for dealing with charges of inadequate representation, but in deposition testimony neither was able to describe that procedure with any specificity. Doherty asserted the responsibility for dealing with that sort of problem belonged to people under him, while Katz indicated the responsibility lay primarily with Doherty. Those differing accounts could, of course, give rise to real conflicts, but that potential has yet to be realized and Clay has offered no evidence indicating that it will be. Once again it is for defendants to

---

**6.** Foran does not represent Friedman in this action, though he apparently still does in the state court malpractice action. It need not now be decided whether any such asserted conflict between Friedman on the one hand and Doherty and Katz on the other is relevant to the present motion.

choose their own theory of their case, and until it reasonably appears their choice gives rise to actual and *unreasonable* conflicts, their choice of counsel should not be disturbed.

In the circumstances, moreover, Foran's statement that his joint representation of defendants entails no conflicts warranting withdrawal merits some deference. See *Halperin,* 542 F.Supp. at 832. This Court will not *presume* reputable counsel have winked at or wholly ignored their responsibilities under the Code, at least when their representations are to the contrary. To give any lesser credence to counsel's representations, and to the bar's capacity for self-regulation, seems both cynical and unwise.

Finally, it appears Foran has taken steps to alert Doherty, Katz and County to the potential disadvantages of joint representation. After conferring with independent counsel, each of them has consented to continued representation by Foran. Clay objects that the affidavits submitted by defendants are too vague to be any more than gestures at consent. She notes accurately the independent counsel is not identified, nor is it clear precisely what was explained. Moreover County's affidavit (prepared by Carl R. Hansen ["Hansen"], Chairman of the Subcommittee on Litigation of the Cook County Board of Commissioners) conditions every assertion on Hansen's information and belief. As Clay says (R. Mem. 14):

> The tenor of the Hansen Affidavit suggests that the decision to waive conflicts was made by others and handed to a "designated affiant." The affidavit is incompetent.

Of course to some extent the generality of the affidavits reflects the speculative nature of the risks and disadvantages at issue. Nevertheless, given the risks Clay has identified, it is appropriate to require submissions establishing more specifically the extent and the efficacy of the disclosure behind each defendant's consent to joint representation. Accordingly this Court's denial of Clay's motion to disqualify Foran is conditioned upon the filing on or before April 26, 1985 of affidavits or other verified documents establishing an adequate basis for defendants' informed consent.

### 3. **Dunton** Implications

As a rule disqualification motions in the joint representation context are "addressed solely to the relationship between the attorney and his immediate clients." *Aetna Casualty & Surety Co. v. United States,* 570 F.2d 1197, 1201 (4th Cir.1978). *Dunton,* however, gave a plaintiff a vital stake in such a motion by reversing his favorable judgment there and forcing a new trial. But it is not clear how broadly *Dunton* is to be read. After all, the basis of the Second Circuit's conclusion that the individual defendant had been adversely affected by joint representation was an actual and egregious conflict.[7] In an effort to relieve the defendant municipality of liability, defense counsel had maintained the individual defendant was not acting within the scope of his duties as a city policeman at the time the alleged harm occurred, but rather as an "irate husband." 729 F.2d at 906. That claim seriously undercut the individual defendant's good faith immunity defense—a defense he had by no means decided to abandon. *Dunton* was not a case like *Sherrod v. Berry,* 589 F.Supp. 433, 437–38 (N.D.Ill.1984), in which the municipality acknowledged the individual defendant had been acting within the scope of his responsibility as a municipal officer. In that instance the conflict of interest remained only a possibility, thus providing no basis for disqualification, much less a new trial.

---

**7.** *Dunton,* 729 F.2d at 907 said of the situation there before the court:

> Because of the imminent threat of a serious conflict, disqualification would have been appropriate here even before any proceedings began.

That statement does not authorize disqualification where conflicts of interest remain merely potential. Rather it acknowledges there are some cases where the risk is so clear and immediate as to make the conflict actual. What Clay has identified does not fall into that category.

In the absence of case law mandating a broad reading of *Dunton,* this Court views it not as a modification of the governing principles under DR 5–105, but rather as a reassertion of the need for sensitivity to the risk of conflict throughout the course of a lawsuit involving multiple representation. Whenever a risk of conflict may fairly be said to have given way to actual conflict, both lawyer and judge must take steps to guard any threatened interests. Such vigilance—effectuated through such means as disclosure and consent, regular individual consultations with each client, checks by independent counsel and judicial monitoring—will be sufficient to guard the interests of both defendants and plaintiffs in *Dunton*-type cases.

Clay is wholly justified in her concern lest this already protracted lawsuit be further frustrated by a trial flawed by application of the *Dunton* rationale. But an unjustified forced change of defense counsel (again!) will also delay the progress of the case. Because Foran's representation of defendants now poses no imminent risk of conflict, there is no reason to interpose that delay. Of course if actual conflicts later emerge, Foran may then be required to withdraw from joint representation. But there is no indication delay at that later point will be substantially more disruptive than delay now, and of course the need may never arise.

### Conclusion

Defendants' motion to disqualify this Court under Section 455(a) is denied. Clay's motion to disqualify Foran is conditionally denied, pending defendants' filing of the submissions described earlier in the text of this opinion.