Joseph J. DUCA, Sr. and Elaine Duca

v.

RAYMARK INDUSTRIES, et al.

Civ. A. No. 84–0587.

United States District Court,
E.D. Pennsylvania.

Sept. 12, 1986.

Norman Perlberger, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Mitchell S. Cohen, Thomas E. Kopil, for plaintiffs.

Arthur Makadon, Philadelphia, Pa., for Raymark Industries, Inc.

G. Daniel Bruch, Jr., Swartz, Campbell & Detweiler, Philadelphia, Pa., for Pacor, Inc.

John Patrick Kelley, Michael P. O'Connor, Krusen, Evans, Byrne, Philadelphia, Pa., for Owens Corning Fiberglas Corp.

## OPINION

PER CURIAM [*].

In June of 1985, a group of asbestos producers and insurers signed an agreement the purpose of which was "to provide for the administration, defense, payment and disposition of asbestos-related claims." That agreement, which is known as the Wellington Agreement, created an organization called the Asbestos Claims Facility ("the Facility"). As part of its provision for the defense of its members in the courts, the Facility has adopted the practice of selecting one or more law firms to represent its members in litigation in each city, and of further selecting a single firm to represent all of its members who are defendants in a single case.

The case under consideration was initiated before the creation of the Facility. Ten of the original defendants became members of the Facility. Two of those defendants, Owens-Corning Fiberglas

[*] Weiner, Broderick and Pollak, JJ.

Corp. and Owens-Illinois, Inc., entered into settlement agreements with plaintiffs before the Facility became involved in the case.[1] The remaining eight Facility members are represented in this case by the firm of White and Williams. White and Williams has stated that it intends to bring cross-claims on behalf of its eight clients (so-called "unsettled defendants") against the two members of the Facility who have settled ("settled defendants"), despite the fact that White and Williams represents the settled defendants in other asbestos cases in which it has been hired by the Facility. Plaintiffs have challenged this conduct as a violation of the applicable standards of legal ethics. They ask this court to disqualify White and Williams or, in the alternative, to bar White and Williams from pursuing cross-claims against the settled defendants. Because this motion raises novel issues and has been filed in numerous cases in this court, oral argument was heard by a panel of three judges.

In order to evaluate plaintiffs' claim that the conduct of White and Williams violates standards of legal ethics, we must closely examine the nature of the interests involved in this case. " '[E]thical problems cannot be resolved in a vacuum.' ... Nor can judges exclude from their minds realities of which fair decision would call for judicial notice." *Silver Chrysler Plymouth v. Chrysler Motor Corp.*, 518 F.2d 751, 753 (2d Cir.1975) (citation omitted) (quoting *Emle Industries, Inc. v. Paten-*

*tex, Inc.*, 478 F.2d 562, 565 (2d Cir.1973). In this case, our attention is drawn to the nature of cross-claims in modern complex tort litigation and to the effect of the Wellington Agreement on the interests of the various defendants. Both of these "realities" cause the true interests of the settled and of the unsettled defendants in this case to diverge from those suggested by the legal form of the cross-claim. *Cf. Seifert v. Dumatic Industries, Inc.*, 413 Pa. 395, 197 A.2d 454 (1964) (looking behind the form of a stockholder derivative action to recharacterize it as a suit between two shareholders). And both suggest that this type of litigation has diverged in significant respects from the traditional "adversarial" model out of which our disciplinary rules emerged and to which they have most often been applied. *Cf. In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 165 (3d Cir.1984) (Adams, J., concurring) (discussing multiple representation in class actions).

Statutory developments in the areas of comparative negligence and contribution among joint tortfeasors, and judicial precedents concerning the effect of partial settlements on the rights of the remaining parties, have, in some states, realigned the interests of the parties in the cross-claim setting.[2] Asbestos defendants have embraced the strategy of using comparative negligence principles (even in strict liability cases) to "reduce the plaintiff's award of damages [at trial] on the basis of the per-

1. An examination of the docket sheet reveals that joint representation did not begin in this case until May 21, 1986, when the firm of White and Williams entered an appearance for seven of the eight defendants it now represents. The eighth was already being represented by White and Williams.

2. We discuss state law in general terms because the question of which state's contribution and damages rules will apply to this case has not been put in sharp focus in connection with the present motion. Under *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), we are required to apply the choice of law rules of the forum state. At oral argument and in supplemental submissions, defendants assumed that Pennsylvania law would apply to these questions. In other motions filed in this case, both

plaintiffs and defendants have assumed that Pennsylvania would apply the law of New Jersey to most aspects of this case. Pennsylvania choice of law principles in tort cases are complex. *See Griffith v. United Airlines*, 416 Pa. 1, 203 A.2d 796 (1964); *see generally Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 169–70 (3d Cir.), *reversed on other grounds*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1980). We need not determine the applicable law for the purposes of this discussion. That the examples in the text of this Opinion are drawn from New Jersey law does not indicate that we have determined that New Jersey law will apply to issues of contribution in this case. For a discussion of some of these issues under Pennsylvania law, *see Rocco v. Johns-Manville Corp.*, 754 F.2d 110 (3d Cir. 1985).

centage share [of fault] attributed to the settling defendants." Alcorn & Erway, Comparative Negligence and Apportionment of Damages, in *Asbestos Litigation: Insurance Issues, Liability, Damages* 142, 147 (W.B. Alcorn, ed. 1982). In some states, defendants who have settled are immune from claims for contribution, but the total damage award against the remaining defendants will be reduced by the amount of the total damages attributable to those settled defendants who are joint tortfeasors. *See, e.g., Riccio v. Prudential Property and Casualty Insurance Co.,* 478 A.2d 785, 787 (N.J.Super.App.Div.) *certification granted,* 99 N.J. 221, 491 A.2d 714 (1984); *Dimogerondakis v. Dimogerondakis,* 485 A.2d 338, 340 (N.J.Super.L. Div.1984).

In this situation, plaintiffs are generally faced with the responsibility of "defending" their settlements, on their own behalf, by refuting the evidence the non-settling defendants put forward to prove, in essence, that the plaintiffs settled with the settled defendants for too small a sum. In this situation, the settled defendants are completely shielded from contribution claims, and thus have no financial interest in the matter (leaving aside problems of collateral estoppel). The battle is entirely between plaintiffs and the non-settling defendants, and the *casus belli* is the size of the damage award at trial.

The Wellington Agreement goes several steps further in realigning the interests of the defendants in asbestos cases. When the Asbestos Claims Facility is involved in a case from its outset, the Facility will not enter into settlements "on behalf of *fewer than all* of the member defendants." Wellington Agreement at ¶ VII(1). Once a case is settled or a verdict is entered, liabili-

ty payments made by the Facility to plaintiffs are assessed against the member defendants pursuant to formulae based upon each member's past experience in the tort system. *See* Wellington Agreement Appendix A-1.[3] The Agreement further provides that "Each Subscribing Producer and each Subscribing Insurer shall forgo all claims for contribution or indemnity ... against other Subscribing Producers and Subscribing Insurers with respect to all asbestos-related claims...." Wellington Agreement at ¶ VIII(2). Thus, the Wellington Agreement envisions that members of the Facility who are co-defendants in a given case will, in general, present a unified defense and settlement strategy, and will adjust the apportionment of liability through processes established by the Facility, rather than through the process of contribution among joint tortfeasors. As a result, the interests of co-defendants who are members of the Facility are not as adverse as are the interests of co-defendants in ordinary tort litigation.

The scheme of joint representation under the Wellington Agreement affects the alignment of interests among co-defendants even when, as in the case before us, the Facility becomes active in the case only after some Facility members have reached settlements. The Facility has interpreted the language of the "no contribution" provision that we discussed above, Wellington Agreement at ¶ VIII(2), to permit the bringing of cross-claims against its settled members, as a method of proving that they were joint tortfeasors and that they were responsible for a larger proportion of the total damages than the amount of their settlements would suggest.[4] White and Williams has represented to this court that

---

**3.** The exception is awards of punitive damages. *See* Wellington Agreement Appendix A-1(C). The contract is ambiguous in several respects as to the role to be played by the Facility when punitive damages are at issue.

**4.** Plaintiffs have argued that this strategy is expressly prohibited by the provisions in the Wellington Agreement concerning claims for indemnity and contribution. Specifically, plaintiffs point to the following provision: "Upon becoming a signatory to the Agreement, all such

claims shall be withdrawn and dismissed from pending actions ... with prejudice and without delay." Wellington Agreement at ¶ VIII(1). White and Williams argues, however, that the "claims" discussed in the quoted paragraph are "claims ... *relating to the application of insurance* to the investigation, settlement, defense or indemnification of asbestos-related claims," *id.* (emphasis added), not claims of the sort at issue here. We cannot say that this is an implausible reading of the Agreement.

the Facility would do so purely for the purpose of reducing the total damage award at trial, and that it has no intention of enforcing the cross-claim judgments against the settled Facility members.[5] Defendants' Memorandum of Law at 19; Transcript of Oral Argument at 58. The settled members would appear to have no reason (again, leaving problems of collateral estoppel aside) to oppose the cross-claims.[6] The interests of the co-defendants are thus closely aligned, notwithstanding the adversarial posture of the cross-claims.

### The Code of Professional Responsibility

In light of this discussion, we must now turn to the Code of Professional Responsibility and the violations plaintiffs claim will occur if White and Williams is permitted to pursue the cross-claims of the unsettled defendants.

As a preliminary matter, White and Williams has challenged plaintiffs' "standing" to object to its conduct. We reject this challenge. Courts have routinely considered challenges raised by opposing counsel. See, e.g., Kramer v. Scientific Control Corp., 534 F.2d 1085 (3d Cir.1976); Rice v. Baron, 456 F.Supp. 1361 (S.D.N.Y. 1978).[7] In any event, it is the responsibility of the court to supervise the conduct of members of its bar, and courts may raise questions of professional ethics sua sponte. Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., 357 F.Supp. 905, 908 (E.D.Pa.1973); Seifert v. Dumatic Industries, Inc., 413 Pa. 395, 197 A.2d 454, 456 n. 5 (1964).

Under Rule 14(IV) of our Local Rules of Civil Procedure, practice before this court is governed by the "Code of Professional Responsibility adopted by the Supreme Court of Pennsylvania." See In re Eastern Sugar Antitrust Litigation, 697 F.2d 524, 529 (3d Cir.1982) (discussing local rule); 42 Pa. C.S.A. (codifying ABA Code of Professional Responsibility).[8]

Canon 4. First, plaintiffs invoke Canon 4 of the Code, which states that "A Lawyer Should Preserve the Confidences and Secrets of a Client." In this circuit, a showing that the confidences of a client or prior client were actually disclosed need not be made. Rather, the test is whether the cases in which the clients are represented by the same attorney concern subject matters that are substantially related, such that the attorney might have the opportunity to disclose or use the confidences of one client in representing the other. American Roller Co. v. Budinger, 513 F.2d 982 (3d Cir.1975).

Plaintiffs contend that in the course of representing the settled defendants in other litigation and participating in the exchange of information concerning matters of interest to all Facility members and their counsel, White and Williams has been in the position to gain confidential informa-

---

5. The law firm of White and Williams has not been named as a party. We characterize this and other statements as made by "White and Williams," rather than by "defendants," because the question of whether the defendants have fully consented to joint representation remains open.

6. Under one plausible interpretation of the "credit" provision, Wellington Agreement at ¶ VII(7), the settled members would derive direct financial benefit from cross-claims against them. This would be the case if the amount expended by the settled members is added to the amount paid in damages by the Facility, the total is then apportioned among all the member co-defendants according to the Facility's formulae, and over- or under-payments by the settled members are adjusted. In this scenario, all member co-defendants, including those who settled, benefit from any reduction in the damage award that is obtained as a result of the cross-claims against the settled defendants.

7. This does not mean that this court is prepared to tolerate the filing of such motions on the eve of trial. See Colanero v. Keene Corp., C.A. No. 84–0818 (E.D.Pa. Aug. 4, 1986) (denying motion identical to the one under consideration here, and noting its untimeliness).

8. We note that the Third Circuit has recently made use of both the Code of Professional Responsibility and the ABA Model Rules of Professional Conduct, the latter of which has not been adopted by the Supreme Court of Pennsylvania. See In re Corn Derivatives Antitrust Litigation, 748 F.2d 157 (3d Cir.1984). In that case, however, the ethical issues arose solely on appeal, and Local Rule 14(IV) applies to this court, not to the Court of Appeals.

tion from the settled defendants that is highly relevant to the cross-claims against the settled defendants. We agree that this is a problem (albeit a lesser one than would present itself in the more usual cross-claim context), and White and Williams' claim that it can prove the cross-claims of the unsettled defendants without using confidential information is of no avail. *Id.* at 986.

■ We note, however, that both the ethical considerations and disciplinary rules under Canon 4 contemplate that an attorney may disclose the confidences or secrets of a client if the client consents. *See* EC 4–2; DR 4–101. We reject plaintiffs' argument that "even if the attorney-client privilege were waivable in this case, plaintiffs have the exclusive right to waive or exercise the privilege as the direct result of the written settlement agreement with the settled defendants," Plaintiffs' Memorandum of Law at 13 (capitalization omitted), in which plaintiffs agree to indemnify and defend the settled defendants against any claims related to this case. The attorney-client privilege, and Canon 4, aim to safeguard the flow of information between client and attorney. *See* EC 4–1. No attorney-client relationship ever existed between plaintiffs and the firm of White and Williams. Therefore, plaintiffs' interests in this matter are not those that Canon 4 seeks to protect.

■ *Canon 5.* Plaintiffs also raise a substantial claim under Canon 5, which states that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Disciplinary Rule 5–105(A) states:

> A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the profferred employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

We find merit in plaintiffs' argument that the interests of the settled defendants and the unsettled defendants differ. As we have already explained, it appears to be the case that their financial interests *in this case* are not adverse. The unsettled defendants will use the device of the cross-claim to establish the settled defendants' status as joint tortfeasors, but will not enforce a judgment against them. Nonetheless, as White and Williams in effect conceded at oral argument, a judgment against a settled defendant may have collateral estoppel effect against that defendant in future cases. Transcript of Oral Argument at 66.[9]

It is certainly conceivable that subsequent cases will arise in which this collateral estoppel effect may be harmful to a particular settled defendant but not to the other defendants, thereby creating a divergence of interests. Such a case would arise, for example, if a judgment against one of the settled defendants were sought to be used against it in a subsequent case in which other Facility members were not joined as defendants.

White and Williams argues in its brief, however, that the settled defendants have consented to its representation of the unsettled defendants in this case by virtue of joining the Asbestos Claims Facility. "Here, the clients themselves created the Asbestos Claims Facility and sought joint representation. The Asbestos Claims Facility and the Wellington Agreement are the product of months of negotiations and careful consideration by all parties concerned of all the ramifications of such an agreement." Defendants' Memorandum of Law at 17. Under DR–105(C),

> In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exer-

---

**9.** White and Williams had taken a different position in its brief. Defendants' Memorandum of Law at 12–13.

cise of his independent professional judgment on behalf of each.

Plaintiffs contend that some conflicts of interest are so severe that they should be prohibited notwithstanding consent by the affected clients. This position is supported by the language of DR–105(C). The rule provides that, for a lawyer to represent multiple clients, two conditions must be met: it must be "obvious that he can adequately represent the interest of each," *and* each must "consent[ ] to the representation after full disclosure." The first condition has been interpreted as an independent requirement. *Unified Sewerage Agency v. Jelco, Inc.,* 646 F.2d 1339, 1345 (9th Cir.1981); *Clay v. Doherty,* 608 F.Supp. 295, 302 n. 5 (N.D.Ill.1985); *Rice v. Baron,* 456 F.Supp. 1361, 1376 (S.D.N.Y. 1978). But while some federal courts have suggested that multiple representation should be barred per se, notwithstanding consent, in cases of particularly clear conflict, these courts have stopped short of promulgating a per se rule. *See In re Corn Derivatives Litigation,* 748 F.2d 157, 162 (3d Cir.1984) (interpreting both ABA Code and ABA Model Rules); *Dunton v. County of Suffolk,* 729 F.2d 903, 908–09 & nn. 4 & 5 (2d Cir.1984); *Clay v. Doherty, supra. See also Unified Sewerage Agency, supra,* (more strongly rejecting per se rule); *In re Taylor,* 567 F.2d 1183 (2d Cir.1977) (same).

Even assuming that some conflicts are so severe that the court must remedy them regardless of the wishes of the affected parties, we do not think that the case we are now considering presents such a conflict. White and Williams entered its appearance as counsel under the Wellington joint representation scheme after defendants Owens-Illinois and Owens-Corning had already settled. White and Williams has never entered an appearance on behalf of the settled defendants *in this case,* and does not represent them *in this case* at the present time. This is not a case in which the same lawyer is sitting "at both counsel tables in contested litigation." Morgan, *The Evolving Concept of Professional Responsibility,* 90 Harv.L.Rev. 702, 727 (1977). *See also In re Corn Derivatives*

*Antitrust Litigation,* 748 F.2d 147, 161 (3rd Cir.1984) (case in which "two clients retained the same law firm to file suit, and where, later, that firm chose to represent one of those clients against the other in the course of the same litigation"); *Rice v. Baron,* 456 F.Supp. 1361, 1364 (S.D.N.Y. 1978) (case in which a firm "suffers from a disabling conflict of interest in attempting to represent *all* of the plaintiffs and counterclaim defendants in this action simultaneously"). Plaintiffs invoke the admonition by the Pennsylvania Supreme Court in the landmark case of *Jedwabny v. Philadelphia Transportation Co.,* 390 Pa. 231, 235, 135 A.2d 252, 255 (1957) that,

> manifestly, there are instances where the conflicts of interest are so critically adverse as not to admit of one attorney's representing both sides. Such is the situation which this record presents. No one could conscionably contend that the same attorney may represent both the plaintiff and defendant in an adversary action. Yet, that is what is being done in this case.

That is not what is being done in the case before us.

This is not to say, however, that the scheme of joint representation under the Wellington Agreement presents no threat that White and Williams will be unable adequately to represent the interests of the settled defendants (in other cases in which they are parties and White and Williams has been hired by the Facility as counsel) and the unsettled defendants (in this and other cases). In this case, White and Williams will, in the course of representing the unsettled defendants, seek to prove that the settled defendants were joint tortfeasors. A judgment to that effect might operate to the settled defendants' detriment in other cases in which the settled defendants are—or are likely to be—represented by White and Williams. Similarly, White and Williams' actual or potential representation of the settled defendants in other cases might well cause White and Williams to sacrifice the individual interests of the unsettled defendants in this case. It might be in the best interests of

one or more of the unsettled defendants, for example, to seek to circumvent the Agreement and press claims for contribution if such claims are permitted by state law. But we do not think that these conflicts, understood in light of the choices represented by the Wellington Agreement, are so acute that this court must take action to remedy them notwithstanding the consent of all the affected defendants.

■ *Canon 9.* Finally, plaintiffs invoke Canon 9 of the Code of Professional Responsibility, which states that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." Canon 9 is generally applied to conduct which does not in fact violate the other canons, but which nonetheless might cause an average layman to think that his interests might be adversely affected by that conduct. *See In re Eastern Sugar Antitrust Litigation,* 697 F.2d 524, 530 (3d Cir.1982). "[I]t is the *appearance,* not the *fact,* of impropriety which Canon 9 is designed to eliminate." *Kramer v. Scientific Control Corp.,* 534 F.2d 1085, 1091 (3d Cir.1976). The interests to be protected are those of the parties and of the legal system. *In re Eastern Sugar Antitrust Litigation, supra,* 697 F.2d at 532.

■ Canon 9 does not specify the scope of an attorney's duty when faced with a situation in which his conduct might be regarded as improper. Plaintiffs have argued that because Canon 9 is concerned with *public* confidence in the legal system, full disclosure and consent are not sufficient to cure conduct that would otherwise violate Canon 9. We reject this view as inconsistent with the Third Circuit approach to Canon 9. The Third Circuit has noted that "[t]he appearance of impropriety standard is necessarily vague," and that the standard has been criticized as "overbroad and question-begging." *In re Eastern Sugar Antitrust Litigation, supra,* 697 F.2d at 530. "To mark its precise contours, this court in the past has looked to other provisions of the ABA Model Code for guidance," including Canons 4 and 5. *Id.* We have held in this Opinion that White and Williams' conduct falls within the prohibitions of Canons 4 and 5. But we have also held that, consistent with the ethical considerations and disciplinary rules under those canons, the conflicts inherent in multiple representation in this case are to be tolerated if the affected defendants consent to them after full disclosure. *See* EC 4–2; DR 4–101; DR 5–105(C). It would be an odd result indeed if clients cannot consent to conflicts which *fall short* of violating Canons 4 and 5. To accept that result would be to write consent out of the Code of Professional Responsibility. We decline to do so.

*The Problem of Consent.* In the context of conflicts of interest which are to be tolerated by the courts if the affected clients consent after full disclosure, this court fulfills its duty under the Code of Professional Responsibility by insuring that the consent of the clients is fully informed. *See Clay v. Doherty,* 608 F.Supp. 295, 305 (N.D.Ill.1985) (discussing "vigilance ... effectuated through such means as disclosure and consent, regular individual consultations with each client, checks by independent counsel and judicial monitoring").

■ On the record before us, this court cannot be satisfied that the defendants subject to the Asbestos Claims Facility's multiple representation scheme have consented to that scheme after full disclosure of the particular kinds of risks created by this litigation. The Facility's position that it has the authority to bring cross-claims against settled Facility members is based, at most, on a plausible interpretation of the terms of the Wellington Agreement. That authority is not expressly *granted* by the Agreement, and there is no assurance that the negotiations leading to the creation of the Facility addressed the issues that have concerned us here.

We will hold plaintiffs' motion under advisement, pending a hearing addressed to the question of consent. At that hearing, the parties will have the opportunity to explore, within the context of the problems identified in this opinion, the degree to which both the unsettled defendants and the settled defendants appreciate and as-

sent to the risks inherent in the Facility's retention of a single law firm, White and Williams, to represent them in numerous asbestos cases, including this one.

An appropriate order is appended.

## ORDER

For the reasons stated in the accompanying *per curiam* opinion, it is hereby ORDERED and DIRECTED that plaintiffs' motion to disqualify the firm of White and Williams from representing any defendants in this action or, in the alternative, to bar the firm of White and Williams from pursuing cross-claims against members of the Asbestos Claims Facility in this action, shall be HELD UNDER ADVISEMENT pending an evidentiary hearing addressed to the question of consent.

The hearing shall be held before Judge Pollak on October 10, 1986 at 9:00 A.M., in Courtroom 16B.