Rose M. GRIVA, Appellant,

v.

Dennis A. DAVISON, et al., Appellees.

No. 92–CV–992.

District of Columbia Court of Appeals.

Argued Nov. 9, 1993.

Decided Feb. 10, 1994.

William Alden McDaniel, Jr., Baltimore, MD with whom Robert G. Cassilly, Bel Air, MD, was on the briefs, for appellant.

Steven M. Pavsner, counsel for Ann T. Maiatico and Michael A. Maiatico, with whom Dennis A. Davison and Cameron Cohick, Washington, DC, counsel for David & Hagner, P.C., were on the brief, for appellees.

Before FERREN, TERRY, and SULLIVAN, Associate Judges.

FERREN, Associate Judge:

This case presents two important questions: when a law firm that represents a three-member partnership also represents two of the individual partners in matters that pertain to the partnership, may the third partner obtain (1) access to the law firm's files concerning not only its representation of the partnership but also its representation of the individual partners in partnership matters, and (2) disqualification of the law firm from representing the partnership? Seeking affirmative answers to these questions, plaintiff-appellant, Rose Griva—a minority partner in a small family partnership—sued five defendant-appellees: the David & Hagner law firm; Dennis A. Davison, Esq., one of the law firm's partners; Ann and Michael Maiatico, appellant's sister and brother; and the Maiatico Family Limited Partnership (MFLP), in which Griva and the Maiaticos were the three general partners. Griva sought declaratory judgments that (1) the individual and law firm defendants had breached their fiduciary duties as lawyers and general partners, respectively, by refusing to disclose MFLP records and files to Griva; (2) these same defendants had conspired to breach their fiduciary duties and were accordingly liable for damages; and (3) David & Hagner (including Davison) should be disqualified from representing MFLP, and MFLP should not have to pay any of the firm's legal fees or expenses. The complaint also sought (4) an injunction to prevent the defendants from refusing to permit Griva to inspect David & Hagner's files pertaining to MFLP and (5) indemnification from MFLP for Griva's legal fees.

The trial court denied Griva's motion for summary judgment, granted summary judgment in favor of the defendants on claims one through four, and granted MFLP's motion to dismiss claim five. Griva appeals summary judgment on the first four claims (but does not appeal the dismissal of claim five), arguing that the trial court should have granted her motion for summary judgment or, alternatively, that the court should have denied defendants' motion because there are genuine issues of material fact requiring a trial. We affirm as to claim two, reverse as to claims one, three, and four, and remand for trial.

I.

This story essentially begins with the fact that Jerry Maiatico, the father of Rose Griva and of Ann and Michael Maiatico, owned 50% of the building located at 1717 H Street, N.W. George Lemm, Sr., through a series of trusts known as the "Lemm Trusts," owned the other 50%. Jerry Maiatico's 50% interest eventually passed to his three children. MFLP presently owns a 40% interest; various Maiatico family trusts own the other 10%. In this opinion, we shall refer to the Lemm Trusts, to MFLP, and to the Maiatico family trusts, collectively, as the "Owners" of the 1717 H Street property.

Appellee Davison and his law firm, appellee David & Hagner, first became involved with Griva and with Ann and Michael Maiatico in 1986, when the Lemm and Maiatico

families retained them to represent the families' interests in the "Neideffer litigation" relating to 1717 H Street. In that litigation, Ann and Michael Maiatico were named as defendants, both as individuals and as officers of two defendant corporations. Rose Griva was not a party to the litigation, but she was involved in the matter as the owner of a 10% beneficial interest in the property, which she had received from her father. During the Neideffer litigation, questions arose as to Jerry Maiatico's mental capacity. As a result, Jerry Maiatico's three children asked Davison and his law firm to initiate proceedings to establish a guardianship for their father's property. Griva, however, also independently consulted about the guardianship matter with her own attorney, Barnum Colton, Esq.

In connection with the guardianship proceedings, David & Hagner prepared an estate planning memorandum intended to minimize the estate tax consequences to Griva and to Ann and Michael Maiatico. This memorandum recommended that the family form a limited partnership, with Rose Griva, Ann Maiatico, and Michael Maiatico as the general partners, to own and manage their 40% interest in the 1717 H Street building. Griva consulted with her own attorney, Colton, on the estate tax planning matter. The three siblings then retained David & Hagner to draft the partnership agreement and to handle formation of the partnership.

David & Hagner organized the partnership, MFLP, as a Maryland limited partnership, with Rose Griva, Ann Maiatico, and Michael Maiatico as the general partners. Throughout the period of establishing MFLP, however, Griva consulted with her attorney, Colton, while Ann and Michael Maiatico consulted with David & Hagner, regarding their respective individual interests. Colton contacted another attorney, Jerry O'Conor, Esq., to provide Griva with a second opinion on the advantages and disadvantages of entering into MFLP. In June 1988, Griva retained O'Conor to represent her for all her legal needs. An escrow letter, which outlined the procedures for establishing MFLP, clearly identified O'Conor as counsel to Griva and David & Hagner as counsel to Ann and Michael Maiatico.

The three general partners executed the MFLP agreement on December 1, 1988. Important in the analysis to follow is the fact that the partnership agreement contains a unanimous consent provision, which Griva had insisted upon at Colton's recommendation.[1]

After organizing MFLP in 1988, David & Hagner continued as general counsel to the partnership. As such, David & Hagner was involved in many transactions on behalf of MFLP and the other Owners of the property. For example, in 1989, David & Hagner represented all the Owners in connection with the negotiation and documentation of asbestos-removal and related construction contracts for the property. Also in 1989, David & Hagner represented MFLP and the other Owners in the negotiation and documentation of a $40,500,000 renovation loan for the building. In 1990, David & Hagner represented all the Owners in the negotiation of leases with tenants, and, in 1992, David & Hagner handled the negotiation of permanent financing for the 1717 H Street property. Because David & Hagner performed all these legal services for the benefit of all the Owners of the 1717 H Street property, all the Owners, including MFLP, paid for the services.

In addition to representing MFLP as an entity, David & Hagner also represented Ann and Michael Maiatico individually, advising them on personal matters as well as on their rights and obligations as partners of MFLP.

David & Hagner also continued to represent all three Maiatico siblings in other family matters. For example, in early 1990, after their father's death, the three Maiaticos, including Rose Griva, retained David & Hag-

---

1. The MFLP unanimous consent provision states in relevant part:

 10. *Management of Business*
 A. All decisions in the management of the business, affairs and assets of the Partnership (including the making of any tax elections) shall be made by the unanimous vote of the general partners. Such management shall in every respect be the full and complete responsibility of the general partners alone.

ner to advise with regard to their duties as personal representatives of their father's estate. The petition filed by David & Hagner in the Orphans' Court for Prince George's County, Maryland, in the matter of the Estate of Jerry Maiatico identified "David & Hagner, P.C.," as "the law firm retained by Michael A. Maiatico, Rose M. Griva, and Ann T. Maiatico."

After formation of MFLP in 1988, Griva's personal attorneys, Colton and O'Conor, continued to represent her in partnership matters. In a letter dated December 9, 1988, eight days after the partnership agreement had been signed, O'Conor informed David & Hagner that O'Conor's firm, Tucker, Flyer, Sanger & Lewis, was Griva's "sole personal representative in all of her legal affairs."[2]

During the three years before this lawsuit was filed in October 1991, O'Conor continued to represent Griva, and David & Hagner continued to represent Ann and Michael Maiatico, regarding their respective rights and obligations as MFLP partners, as well as concerning numerous disputes among the partners affecting redevelopment of the 1717 H Street property. Accordingly, during that period, David & Hagner had two related roles: (1) representation of MFLP as such, and (2) representation of two of MFLP's general partners in support of their individual partnership interests. This dual representation by David & Hagner ultimately led Griva, in a letter dated September 16, 1991, to request access to "all of the books, records and files of the [MFLP] in [David & Hagner's] possession"—a request that eventually resulted in the present litigation.

According to Griva, three incidents led to her demand for the law firm's MFLP files. First, in the summer of 1990, MFLP became involved in negotiations with the World Bank for leasing office space at 1717 H Street. Acting on the advice of Davison and David & Hagner, Ann and Michael Maiatico sought to resurrect an old 1717 H Street lease that once had served as a lease of the entire building to an entity known as Matomic Operating Co. (Matomic), which was owned by the Maiatico and Lemm families. In July 1990, allegedly without any notice or explanation, David & Hagner sent O'Conor a Net Lease dated in 1966, along with a First Amendment to Net Lease, between the Owners of 1717 H Street and Matomic. According to O'Conor, pursuant to the net lease and amendment, the Owners of 1717 H Street would have leased the entire building to Matomic, and Matomic in turn would have had the right to sublease the commercial space to tenants. Griva was a Matomic shareholder, but she had no control over the management of the company because she was not a director (and was later removed as an officer sometime around January 1, 1991). Because of MFLP's unanimous consent provision, Griva had a substantial measure of control—indeed, veto power—over the property when MFLP had a management role, but if MFLP's management position were relinquished through the proposed lease to Matomic, Griva would have had no control over the property. According to O'Conor, the effect of this transaction would have been "to deprive [Griva] of certain management rights" over the building, since the lease would have "conferred broad authority on Matomic as to the operation and management of the property."

The second instance that led to Griva's request for access to all of David & Hagner's files concerning MFLP was a series of entries in the law firm's bills to the Owners. Three entries for June 1989 indicated that David & Hagner had prepared a memorandum, and had had discussions within the firm—and presumably with the Maiaticos— about "dissolution of [the] deadlocked MFLP."[3] Griva learned of these activities

---

2. The letter further stated:

> I have been requested by Mrs. Griva to inform you that this firm is her sole representative in all of her legal affairs (including, without limitation, with respect to any rights or obligations that she may have as a general partner of the Maiatico Family Limited Partnership). Accordingly, any documents requiring her signa-

ture or approval ... or any matters warranting her review and comment should be directed to me so that I can properly advise her.

3. The three June 1989 entries provided in relevant part:

> 06/07/89 R. Reeves Review Eric Berger memorandum regarding deadlocked partnerships.

by reviewing the law firm's bills, addressed to the 1717 H Street Owners, in care of Ann T. Maiatico, Owners Operating Co.

Finally, Griva noticed a David & Hagner billing entry for April 4, 1991, referring to a conversation between Davison and Ann Maiatico "re dissolving MFLP."[4] At that point, Griva began to take steps to learn details about what David & Hagner was doing for her brother and sister concerning MFLP. In a letter dated September 16, 1991, another lawyer for Griva, William Alden McDaniel, Esq., Griva's counsel in the present litigation, requested on Griva's behalf that David & Hagner "make arrangements for [Griva] and her counsel to review all of the books, records and files of the [MFLP] in [David & Hagner's] possession."

In a series of letters responding to Griva's request, David & Hagner: (1) asked the purpose of Griva's request; (2) asserted that Griva and her attorney, O'Conor, had copies of all documents and correspondence relating to MFLP; and (3) replied that David & Hagner could not respond to Griva's request in light of MFLP's unanimous consent provision and of Ann and Michael Maiatico's letter to Griva refusing consent to Griva's review of the files.

■ By letter of September 30, 1991, McDaniel told Davison that "Mrs. Griva, as of this day ... does not consent to the representation by David & Hagner, of the [MFLP]." A week and a half later, on October 10, 1991, Griva filed suit to obtain access to David & Hagner's records pertaining to MFLP and to have David & Hagner removed as partnership counsel.[5] Griva sought declaratory judgments that the defendants (1) had breached their fiduciary duties as lawyers and general partners by refusing to disclose MFLP records; (2) had conspired to breach their fiduciary duties, entitling Griva to damages; and (3) no longer could retain David & Hagner as MFLP counsel or pay any of David & Hagner's legal fees or expenses. Griva also sought (4) an injunction to prevent the defendants from refusing her request to inspect David & Hagner's files relating to MFLP and (5) indemnification from MFLP for Griva's legal fees.

Represented by David & Hagner, MFLP immediately moved to dismiss claim five, the only one naming MFLP as a defendant. MFLP asserted that, under Maryland law, Griva could seek indemnity from MFLP only in the context of a final partnership accounting, which had not yet occurred. The trial court granted MFLP's motion and dismissed claim five with prejudice. Griva does not challenge that dismissal on appeal. MFLP itself, therefore, is no longer a party to this litigation.

After the close of discovery, Griva moved for summary judgment on claims one, three,

06/12/89 R. Reeves Review memo by Eric Berger regarding deadlocked partnerships.
06/13/89 R. Reeves Conference in office with Dennis A. Davison, Esq. regarding dissolution of deadlocked partnerships.

4. The April 4, 1991 entry provided in relevant part:

04/04/91 D. Davison Telephone conference with Ann Maiatico re dissolving MFLP.

5. In her complaint, Griva sought all "documents, records, papers, and files, of any description whatsoever, which reflect or relate to the business of defendant, the Maiatico Family Limited Partnership." Although Griva continues to seek access to "all files relating to the MFLP" in David & Hagner's possession, Griva emphasizes on appeal that she is specifically entitled to access to "the David & Hagner files that relate to the supposedly-separate representation of Ann Maiatico and Michael Maiatico by Davison and David & Hagner in matters concerning the

MFLP." It does not appear from the record that the parties currently dispute Griva's right of access to, or possession of, the documents relating to MFLP's business. Griva admitted that she has amassed some 10,000 pages of documents pertaining to the 1717 H Street property and that she has had access to all bills from David & Hagner to the Owners of the property. We therefore focus on what appears to be the parties' central dispute: whether Griva is entitled to see the files and records relating to David & Hagner's individual representation of the Maiaticos on MFLP matters. If, however, Griva contends that she does not have access to records relating to MFLP's business, then the trial court may address that issue on remand. Partners are entitled to complete access to partnership books, and all partners have an obligation "to make full disclosure of all known information that is significant and material to the affairs or property of the partnership." Herring v. Offut, 266 Md. 593, 295 A.2d 876, 879 (1972); see United States v. Mandel, 437 F.Supp. 258, 261 (D.Md.1977); Md. Code Ann., Corps & Ass'ns § 9–402, –403 (1993).

and four. Defendants filed a Joint Motion To Dismiss And/Or For Summary Judgment, seeking summary judgment as to claims one, three, and four and dismissal for failure to state a claim as to claim two. The trial court denied Griva's motion and granted summary judgment for defendants on claims one, two, three, and four.

On appeal, Rose Griva challenges the trial court's denial of her motion for summary judgment and argues, alternatively, that summary judgment in defendants' favor was improper because there are genuine issues of material fact requiring a trial as to claims one through four.

## II.

### A. *Questions Presented*

In order to decide whether Griva is entitled to see David & Hagner's files on its representation of the Maiaticos on MFLP matters and whether that firm must be disqualified from representing MFLP, we must resolve several related issues.

1. David & Hagner's (including Davison's) dual representation of MFLP and the Maiaticos began in 1988, when the Code of Professional Responsibility was in effect. The dispute between Griva and the Maiaticos also began in 1988 and continued until October 1991, when suit was filed, and thereafter. In the meantime, effective January 1, 1991, new Rules of Professional Conduct, replacing the Code, began to apply to the lawyers' conduct. We therefore have to consider, both under the Code and under the Rules—as applied to the facts here—whether a law firm for a partnership may also represent some of its partners, individually, in matters related to the partnership.

2. If such dual representation is ever permissible, what sort of disclosure by the law firm to the other partners, and what kind of consent by those partners, will be required?

3. If a law firm violates the Code of Professional Responsibility or the Rules of Professional Conduct in representing both the partnership and some individual partners with respect to partnership matters, what remedies, if any, are available to a dissenting partner against the lawyers? Against the other partners?

### B. *Criteria for Summary Judgment*

Super.Ct.Civ.R. 56(c) requires the trial court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of demonstrating clearly the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *See Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983). To survive a summary judgment motion, "the opposing party need only show that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979) (quoting *International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 782 (D.C.1976), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)). If the offered evidence and related inferences would permit the factfinder to find for the nonmoving party under the appropriate burden of proof, the motion for summary judgment must be denied. *See id.* "Our standard of review of a trial court order granting a motion for summary judgment is the same as that applied by the trial court when it considers the motion in the first instance." *Government Employees Ins. Co. v. Group Hospitalization Medical Servs., Inc.,* 602 A.2d 1083, 1086 (D.C.1992).

## III.

In granting summary judgment, the trial court necessarily concluded as a matter of law that, on the facts seen in the light most favorable to Griva (primarily from deposition testimony), the Maiaticos and the lawyers breached no fiduciary duties that warranted declaratory or injunctive relief for Griva. We begin by examining the legal ethics applicable to David & Hagner (including Davison)—beginning in 1988—to determine the basis, if any, for the lawyers' alleged breach of fiduciary duties. We then apply those rules to the facts of record most favorable to

Griva, in order to determine whether there are genuine issues of material fact which, if resolved in Griva's favor, would warrant relief. In this connection, although we focus on the lawyers' ethics and duties, we recognize that there may be issues as to whether the individual partner defendants, the Maiaticos, themselves committed a breach of fiduciary duty as co-partners, and whether any such breach attributable to them would necessarily be derived from the lawyers' breach and the Maiaticos' involvement in it.[6]

## A. *Dual Representation of an Entity and its Constituents*

The Code of Professional Responsibility and the Rules of Professional Conduct both warn against the dangers of a lawyer's multiple representation of conflicting or potentially conflicting interests. This case presents allegations of misconduct that occurred both before January 1, 1991, when the Code was in effect, and after that date, when the Rules became effective. We therefore must evaluate the allegations in connection with the provisions of the Code or of the Rules that applied at the time of each alleged breach of duty. *See* D.C.App.R.X, app. A, Editor's note (1993).

### 1. *The Code of Professional Responsibility*

The Code is comprised, fundamentally, of nine "Canons," which the drafters character-

ized as "statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession." MODEL CODE OF PROFESSIONAL RESPONSIBILITY preliminary statement at 2 (Final Draft 1969). The Canons contain the disciplinary rules ("DRs"). As a preface to each Canon and related disciplinary rules, the Code supplies several paragraphs of ethical considerations ("ECs") which, according to the drafters, are "aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations." *Id.* (footnote omitted).

Canon 5, "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client," reflects an ethical consideration of special relevance here. D.C. CODE OF PROFESSIONAL RESPONSIBILITY Canon 5 (1989). EC 5–18 stresses that "[a] lawyer employed or retained by a corporation or similar entity owes his [or her] allegiance to the entity" and not to any of its constituent members.[7] D.C. CODE OF PROFESSIONAL RESPONSIBILITY EC 5–18. This Ethical Consideration applies to the representation of partnerships as well as corporations and other

---

6. Claim one of Griva's complaint asserts that David & Hagner and Ann and Michael Maiatico breached their fiduciary duties to Griva by denying her access to MFLP's files in David & Hagner's possession. Because of the nature of relief Griva requests—disclosure of law firm records and disqualification of MFLP's attorney—we focus on David & Hagner's fiduciary duty to Griva. We note, however, that Griva also contends that her partners, the Maiaticos, owe her a fiduciary duty based on Maryland partnership law. *See* MD.CODE ANN., CORPS. & ASS'NS § 9–403, –404. "The partnership relationship is of a fiduciary character which carries with it the requirement of utmost good faith and loyalty and the obligation of each member of the partnership to make full disclosure of all known information that is significant and material to the affairs or property of the partnership." *Herring*, 295 A.2d at 879. We do not address the merits of Griva's claim that the Maiaticos breached their fiduciary duties to her. The trial court, however, may address this contention if the parties pursue it at trial.

7. EC 5–18 provides in full:

> A lawyer employed or retained by a corporation or similar entity owes his [or her] allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his [or her] professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him [or her] in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

D.C. CODE OF PROFESSIONAL RESPONSIBILITY EC 5–18 (1989). The Code is contained in D.C.App.R.X., app. A (1989).

organizations. *See Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1240 (S.D.N.Y.1984) (court recognized that limited partnership is "similar entity" to corporation for purposes of EC 5–18). The Code, therefore, expressly recognizes in EC 5–18 that a lawyer for an entity, including a partnership, represents the entity, not its constituents, and thus that conflicts potentially may arise if the lawyer also advises the entity's constituents individually. According to EC 5–18, *supra* note 7, "in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present."

How can a lawyer be "convinced" in a particular situation that dual representation of an entity and one or more of its constituents will not be unethical? A lengthy disciplinary rule under Canon 5, DR 5–105, provides the guidelines.[8] D.C. Bar Legal Ethics Comm.Op. 159 (1985) applies DR 5–105 in the context of a lawyer's dual representation of an association and one of its members:

> [T]he attorney cannot represent both the association and one of its members: (a) if the attorney's independent professional judgment in behalf of either the association or the member "will be or is likely to be adversely affected" by his [or her] representation of the other; or (b) if representing both the association and one of its members "would be likely to involve him [or her] in representing differing interests."

113 Daily Wash.L.Rptr. 202 at 2120 (Oct. 18, 1985). The opinion then discusses the DR 5–105(C) exception: a lawyer may represent both an association and one or more of its members "if it is obvious that the attorney can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his [or her] independent professional judgment on behalf of each." *Id.*

■ Accordingly, an attorney may represent both a partnership and one of its partners, where such representation "would be likely to involve ... representing differing interests," only if (1) it is "obvious" that the attorney can adequately represent the interests of each and (2) "each consents" to the representation (3) after "full disclosure." DR 5–105, *supra* note 8. *See Unified Sewerage Agency v. Jelco, Inc.,* 646 F.2d 1339, 1345 (9th Cir.1981); *Duca v. Raymark Indus.,* 663 F.Supp. 184, 190 (E.D.Pa.1986); *Clay v. Doherty,* 608 F.Supp. 295, 302 n. 5 (N.D.Ill. 1985). Clearly, therefore, there can be situations where, despite full disclosure and consent, dual or multiple representation will be ethically proscribed. "If a reasonable observer perceives a likelihood of adverse effect under DR 5–105(B), then, by definition, the 'obviously adequate' prong of the DR 5–105(C) test cannot be satisfied." *Clay,* 608 F.Supp. at 302 (footnote omitted).

David & Hagner undertook dual representation of MFLP and of Ann and Michael Maiatico when the three partners organized MFLP on December 1, 1988. As to the period before 1991, while the Code of Professional Responsibility was in effect, there were two alleged improprieties based on deposition testimony and exhibits: (1) David & Hagner began counseling Ann and Michael

---

8. DR 5–105 provides:

> DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.
> (A) A lawyer shall decline proffered employment if the exercise of his [or her] independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him [or her] in representing differing interests, except to the extent permitted under DR 5–105(C).
> (B) A lawyer shall not continue multiple employment if the exercise of his [or her] independent professional judgment in behalf of a

client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him [or her] in representing differing interests, except to the extent permitted under DR 5–105(C).
> (C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he [or she] can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his [or her] independent professional judgment on behalf of each.

D.C. CODE OF PROFESSIONAL RESPONSIBILITY DR 5–105.

Maiatico, individually, in July 1990, about using the Matomic lease as a way of eliminating MFLP's management role over the 1717 H Street property; and (2) three David & Hagner billing entries in 1989 concerned "dissolution of deadlocked partnerships," apparently reflecting contacts with the Maiaticos. Griva contends that these instances evidenced the lawyers' representation of differing interests, which the Code prohibited in the absence of both clients' informed consent. Griva contends that she did not "consent" to the dual representation after "full disclosure."[9]

Appellees contend that Griva not only consented to the dual representation after full disclosure but also evidenced her informed consent by retaining her own personal attorneys to represent her in all MFLP matters.

Much of the dispute is premised on Griva's contention—and appellees' refutation—that Griva remained a client of David & Hagner after MFLP was formed. There appears to be little, if any, dispute that before creation of MFLP (and even on occasion thereafter not involving MFLP), David & Hagner represented Griva, as well as her brother and sister, from time to time, and that the law firm represented all three siblings in the creation of MFLP, although Rose Griva used other counsel as well. As to the period after creation of MFLP, Griva claims she was a David & Hagner client because of its MFLP representation, especially because MFLP was so small that any law firm representing the partnership necessarily represented each partner individually. *See Wortham & Van Liew v. Superior Court (Clubb)*, 188 Cal. App.3d 927, 233 Cal.Rptr. 725, 728 (Cal.Ct. App.1987) ("attorney for partnership represents all the partners as to matters of partnership business"); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 361 (1991) (hereafter ABA Formal Op. 361) ("In small partnership, as with closely held corporations, it is more difficult to distinguish between representation of the entity and of its individual owners.").

Appellees contend, to the contrary, that David & Hagner (including Davison) never represented Griva after formation of MFLP. They proffer record evidence that, although David & Hagner represented Griva, along with her siblings, in matters involving their father's estate, Griva subsequently retained her own attorney, O'Conor, to represent her individually when David & Hagner organized MFLP, as well as to represent her in subsequent partnership affairs. Appellees then note that a lawyer's representation of a partnership does not necessarily mean the lawyer represents the individual partners. According to ABA Formal Op. 361 (interpreting the ABA Model Rules but applicable as a general proposition):

> An attorney-client relationship does not automatically come into existence between a partnership lawyer and one or more of its partners.... Whether such a relationship has been created almost always will depend on an analysis of the specific facts involved.

ABA Formal Op. 361 (citations omitted). Thus, say appellees, the question whether a lawyer for a partnership also represents its individual partners is answered, not automatically, but by reference to all the facts and circumstances, including such factors as

> whether the lawyer affirmatively assumed a duty of representation to the individual partner, whether the partner was separately represented by other counsel when the partnership was created or in connection with its affairs, whether the lawyer had represented an individual partner before undertaking to represent the partnership, and whether there was evidence of reliance by the individual partner on the lawyer as his or her separate counsel, or of the partner's expectation of personal representation.

*Id.* (footnote omitted).

On this record, we agree to some extent with appellees. There is undisputed evidence that Griva retained attorney O'Conor—in the words of his December 9, 1988

---

9. Griva has not argued on appeal that the Code of Professional Responsibility absolutely prohibited David & Hagner from representing these differing interests—even with informed consent— on the ground that it was not "obvious" that David & Hagner (including Davison) could "adequately represent the interest of each." DR 5–105.

letter to David & Hagner—to be Griva's "sole personal representative in all of her legal affairs (including, without limitation, with respect to any rights or obligations that she may have as a general partner of [MFLP])." Thus, it is difficult to perceive how Griva continued, formally, as an individual client of David & Hagner once MFLP was organized. Under the circumstances, however, we need not answer that question, or even resolve whether there is a genuine issue of material fact as to whether Griva was formally a David & Hagner client by virtue of being a member of a partnership represented by that firm. Because of the particulars of the MFLP partnership agreement, it would appear that Griva, functionally, was a David & Hagner client.

More specifically, the parties acknowledge that the unanimous consent provision in the partnership agreement, see *supra* note 1, gave Griva veto power over partnership action. Thus, Griva could deadlock MFLP when she disagreed with her brother and sister. In this sense Griva herself had the power to keep MFLP at odds with the wishes or interests of her brother and sister, with the result that, when David & Hagner confronted differences between Griva and the Maiaticos, the law firm effectively confronted differences between the deadlocked MFLP and the Maiaticos. Accordingly, rather than analyzing David & Hagner's dual representation as a potential conflict between Griva and her siblings, as though both Griva and the Maiaticos were clients of the firm, we may simply analyze the ethical issue as the dual representation of MFLP and the two Maiaticos—the result being that any conflict in fiduciary obligation reflected in those two representations would cover any possible conflict that might arise if Griva herself were an individual client of the firm.[10]

10. There is another way of looking at this situation. By virtue of the partnership veto provision and the resulting tendency of the partnership to deadlock, the law firm—trying to represent both the entity (MFLP) and two of its constituents (the Maiaticos)—cannot tell what positions on partnership issues reflect the partnership's true interest. Seen in this way, the law firm faces two potentially conflicting representations, which may necessitate the law firm's withdrawal from partnership representation. (We do not comment on the question whether the law firm would also have to withdraw from representation of the partnership's constituents in that situation.)

This question of who represents the entity's true interest is confronted in D.C. Bar Legal Ethics Comm.Op. 216 (1991), 119 Daily Wash. L.Rptr. 97 at 1063 (May 20, 1991), which applied Rule 1.13(a) of the Rules of Professional Conduct. See *infra* note 11. An attorney represented a corporation having two 50% shareholders in a suit against a bank, alleging that the bank had wrongfully terminated a banking relationship with the corporation. The shareholders had defaulted on personal loans from the same bank, and the bank foreclosed against the corporation's shares of one of them, thereby becoming a 50% owner of the corporation. The bank filed an action to dissolve the corporation, and the question presented was whether the lawyer could represent the corporation against the bank, *i.e.*, against the new 50% shareholder. The Legal Ethics Committee opined that the attorney could do so unless such representation, reflecting decisions by the other 50% shareholder acting as president, would violate the president's own fiduciary duties to the corporation—in which case "the lawyer may be forced to seek guidance from the courts as to who is in control of the corporation, there being no higher authority within the corporation to whom the lawyer can turn." We do not address the propriety of this opinion, other than to agree with the following language that reflects generally applicable principles:

The principle that a lawyer representing a corporation represents the entity and not its individual shareholders or other constituents applies even when the shareholders come into conflict with the entity. Courts have generally held, therefore, that a corporation's lawyer is not disqualified from representing the corporation in litigation against its constituents. A different result [*i.e.*, disqualification] may sometimes be required where the shareholders of a closely held corporation reasonably might have believed they had a personal lawyer-client relationship with the corporation's lawyer. [Citations omitted.]

\* \* \* \* \* \*

Throughout the representation [of the corporation], the lawyer must continue to recognize that the interest of the corporation must be paramount *and that he [or she] must take care to remain neutral with respect to the disputes between the present shareholders.*

*Id.* at 1064–65 (emphasis added). Although this language is from an ethics opinion addressing a factual situation quite different from the one at hand, the principle is nonetheless applicable here: a lawyer for an entity cannot represent constituents of an entity when such representation may prejudice the interests of that entity, or when it is unclear what constituents represent the interests of the entity and thus a dispute between constituents makes it impossible to know what the entity's interests are.

■ After applying the ethical rules of DR 5–105, as properly interpreted in D.C. Bar Legal Ethics Comm.Op. 159, we conclude that there are genuine issues of material fact relating to conduct that occurred during the period before July 1, 1991 that preclude summary judgment here. Because Griva has not yet contested the point, see *supra* note 9, we assume for purposes of this appeal, with respect to the Matomic lease transaction and to the David & Hagner billing entries about "dissolution of deadlocked partnerships," that it was "obvious," DR 5–105(C), that David & Hagner could adequately represent the interests of both MFLP and the Maiaticos. This leaves two genuine issues of material fact: (1) whether David & Hagner fully disclosed to MFLP the scope of its representation of the Maiaticos in MFLP partnership matters; and, if so, (2) whether MFLP consented to David & Hagner's dual representation of the partnership and of Ann and Michael Maiatico.

### 2. *The Rules of Professional Conduct*

■ As indicated earlier, the Code of Professional Responsibility gave way effective January 1, 1991, to new Rules of Professional Conduct. While the Rules impose ethical restraints on lawyers that typically are similar, or even virtually identical, to those prescribed by the Code, the Rules are considerably more detailed and, in a number of instances, prescribe ethical restraints that materially differ from those in the Code. It is important, therefore, to evaluate under the new Rules Griva's third major complaint: a David & Hagner billing entry showing that

Davison conversed on April 4, 1991 with Ann Maiatico "re dissolving MFLP."

Like EC 5–18 and DR 5–105 under the Code, Rules 1.13 and 1.7, taken together, cover the situation when a lawyer wishes to represent both an entity and one or more of its constituent members.[11] ABA Formal Op. 361 discusses Rule 1.13 in the context of a lawyer who represents a partnership:

> [A] lawyer who represents a partnership represents the entity rather than the individual partners unless the specific circumstances show otherwise.... Representation of the partnership does not necessarily preclude the representation of individual partners in matters not clearly adverse to the interests of the partnership.

Comment [8] to Rule 1.13 elaborates the responsibility of a lawyer for an organization, such as a partnership, when the lawyer perceives a possible conflict between the interests of the organization and of particular members:[12]

> There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer shall advise any constituent, whose interest the lawyer finds adverse to that of the organization, of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there *is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constitu-*

11. Specifically, Rule 1.13 provides:

Rule 1.13. ORGANIZATION AS CLIENT.

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

(b) In dealing with an organization's directors, officers, employees, members, shareholders, or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests may be adverse to those of the constituents with whom the lawyer is dealing.

(c) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the

dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.13. The Rules are contained in D.C.App.R.X, app. A (1993).

12. According to the Scope provision of the Rules, "[t]he Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule.... The Comments are intended as guides to interpretation, but the text of each rule is controlling." D.C.App.R.X, app. A, Scope at 152.

*ent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.*

D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.13 cmt. [8] (1993) (emphasis added). Accordingly, when a lawyer represents both a partnership and one or more of its partners individually, and a conflict arises between the partnership and a client-partner, the lawyer must inform the individual client-partners of the conflict and of the fact that their discussions may not be privileged from disclosure to the partnership. Further, the lawyer must explain to the client-partners that the lawyer no longer can represent them because that lawyer's loyalty must remain, above all, with the partnership.

Rule 1.13(c), however, establishes an exception permitting such dual or multiple representation if it meets the requirements of Rule 1.7, the general rule governing conflicts

of interest.[13] It is important to note at the outset that this court adopted a version of Rule 1.7 which substantially differs from the American Bar Association's Model Rule 1.7.[14] The legislative history of our Rule 1.7 reflects an intention to divide potential conflict of interest situations into three categories: (1) cases in which representation is absolutely forbidden, (2) cases in which dual representation is permissible after informed consent of all affected clients is obtained, and (3) cases in which dual representation is permitted without client consent. *See* Proposed Rules of Professional Conduct and Related Comments, Showing the Language Proposed by the American Bar Association, Changes Recommended by the District of Columbia Bar Model Rules of Professional Conduct Committee, and Changes Recommended by the Board of Governors of the District of Columbia Bar, at 68 (Nov. 19, 1986) (hereafter Legislative History).[15] The District of

---

13. Rule 1.7 provides:

Rule 1.7. CONFLICT OF INTEREST: GENERAL RULE.
 (a) A lawyer shall not represent a client with respect to a position to be taken in a matter if that position is adverse to a position taken or to be taken in the same matter by another client represented with respect to that position by the same lawyer.
 (b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:
 (1) A position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter;
 (2) Such representation will be or is likely to be adversely affected by representation of another client;
 (3) Representation of another client will be or is likely to be adversely affected by such representation; or
 (4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.
 (c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if:
 (1) Each potentially affected client provides consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and
 (2) The lawyer is able to comply with all other applicable rules with respect to such representation.

D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.7.

14. ABA Model Rule 1.7 provides:

RULE 1.7 Conflict of Interest: General Rule
 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (2) each client consents after consultation.
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation.
 When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7 (1992).

15. After adoption of the Model Rules of Professional Conduct by the House of Delegates of the American Bar Association, the Board of Governors of our unified Bar appointed a District of Columbia Bar Model Rules Committee, chaired by Robert E. Jordan, III, Esq., to make recommendations to the Board with respect to the ABA Model Rules. That Committee, after thorough—indeed, exhaustive—study, proposed to the Board adoption of Rules reflecting extensive changes from the ABA Model Rules Provisions. The Board of Governors then examined these

Columbia Bar Committee that initially reviewed the ABA Model Rules, see *supra* note 15, concluded that Model Rule 1.7 "obscure[d] the difference[s]" among these three categories, *id.*, and, therefore, recommended modifications of Model Rule 1.7 which the Board of Governors of the Bar, and then this court, adopted. See *supra* note 13.

■ The principal purpose of these changes was to state more clearly and unequivocally than ABA Model Rule 1.7 "that there are circumstances in which representation is absolutely forbidden." *Id.* According to the Legislative History, at 68:

> The absolute prohibition provided in subparagraph (a) [of the D.C. Bar Committee's recommended Rule 1.7] is a codification of the absolute prohibition held to exist in case law decided under the "appearance of impropriety" test. *See, e.g., Westinghouse v. Kerr–McGee*, 580 F.2d 1311 (7th Cir.1978); *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976). The standard stated in the Committee's proposal is, however, far preferable to the "appearance of impropriety" test because [the Committee's proposal] is stated in clear and objective terms. It is also preferable to the ABA draft because the ABA rule does not make clear in so many words

proposals at great length, accepting many and suggesting still other changes. The Board's recommendations to the court were packaged in a way that showed the ABA Model Rules provisions, the changes recommended by the D.C. Bar ("Jordan") Committee, and the changes from the Committee proposals recommended by the Board of Governors to the court. This is the package of materials we call the "Legislative History." This court made still additional changes before final adoption of the Rules but none affecting Rule 1.7 except additional Comments not relevant here.

16. *Compare* DR 5–105(C), *supra* note 8: a lawyer may not represent multiple clients, even with consent after full disclosure, unless it is "obvious" the lawyer can "adequately represent the interest of each."

17. Comment [4] also provides an example which demonstrates the distinction between Rule 1.7(a) and Rule 1.7(b):

> This approach is intended to reduce the costs of litigation in other representations where parties have common, nonadverse interests on

that there are some types of representation that are, in fact, absolutely forbidden. Thus, this court's Rule 1.7(a) mandates an absolute prohibition of dual or multiple representation when the lawyer would represent clients with "adverse" "position[s]" in the "same matter." See *supra* note 13. Client consent cannot cure such a conflict.[16]

Rules 1.7(b) and (c), see *supra* note 13, set forth a second category of cases in which dual or multiple representation is permissible if the lawyer obtains consent from all affected clients after full disclosure of the conflict. The distinction between Rule 1.7(a) and Rule 1.7(b) is obscure, but Comment [4] provides some clarification:

> The absolute prohibition of paragraph (a) applies only to situations in which a lawyer would be called upon to espouse adverse positions in the same matter. It is for this reason that paragraph (a) refers to adversity with respect to a "position taken or to be taken" in a matter rather than adversity with respect to the matter or the entire representation.[17]

D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. [4].

Comment [6] under Rule 1.7 clarifies the types of conflicts to which the absolute prohibition of paragraph (a) applies:

> certain issues, but have adverse (or contingently or possibly adverse) positions with respect to other issues. If, for example, a lawyer would not be required to take adverse positions in providing joint representation of two clients in the liability phase of a case, it would be permissible to undertake such a limited representation. Then, after completion of the liability phase, and upon satisfying the requirements of paragraph (c) of [Rule 1.7], and of any other applicable Rules, the lawyer could represent either one of those parties as to the damages phase of the case, even though the other, represented by separate counsel as to damages, might have an adverse position as to that phase of the case. Insofar as the absolute prohibition of paragraph (a) is concerned, a lawyer may represent two parties that may be adverse to each other as to some aspects of the case so long as the same lawyer does not represent both parties with respect to those positions. Such a representation comes within paragraph (b), rather than paragraph (a), and is therefore subject to the consent provisions of paragraph (c).
> D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. [4].

The prohibition of paragraph (a) relates only to *actual conflicts of positions*, not to mere formalities. For example, a lawyer is not absolutely forbidden to provide joint or simultaneous representation if the clients' positions are only nominally but not *actually adverse*. Joint representation is commonly provided to incorporators of a business, to parties to a contract, in formulating estate plans for family members, and in other circumstances where the clients might be nominally adverse in some respect but have retained a lawyer to accommodate a common purpose. If no *actual conflict of positions* exists with respect to a matter, the absolute prohibition of paragraph (a) does not come into play.

D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. [6] (emphasis added).[18]

 Based on the Rules, comments, and legislative history, we conclude that a law firm ethically can represent several individuals in creating a partnership after obtaining their informed consent pursuant to Rule 1.7(c). *See id.* Moreover, Rules 1.13(c) and 1.7(b) and (c) make clear that, with the informed consent of all affected clients, a law firm ethically can represent a partnership and one or more of its individual partners at the same time—including representation as to matters affecting the partnership—except when such dual or multiple representation would result in an "actual conflict of positions," *id.*, in which case the absolute prohibition of Rule 1.7(a) comes into play.

We therefore must ask: on this record, are there genuine issues of material fact as to whether David & Hagner (including Davison) have violated Rules 1.13 and 1.7 in representing both MFLP and two of its partners individually?

We conclude, clearly, that there are such genuine issues. Griva has not yet argued that Rule 1.7 absolutely prohibited David & Hagner from jointly representing her and MFLP. Accordingly, we assume for pur-

poses of this appeal that the conversations between Davison and Ann Maiatico "re dissolving MFLP," as described in the firm's billing entry for April 1, 1991, did not reflect an actual conflict of "position" between MFLP and the Maiaticos, within the meaning of Rule 1.7(a), that not only may have required disclosure to all MFLP partners, *see* D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.13 cmt. [8]; ABA Formal Op. 361 at 15 (citing *Wortham*, 233 Cal.Rptr. 725, 233 Cal. Rptr. 725, and *Fassihi v. Sommers*, 107 Mich.App. 509, 309 N.W.2d 645 (1981)), but also may have necessitated automatic disqualification of David & Hagner from representing MFLP.

Even if this billing entry, when fully explained, did not reflect a Rule 1.7(a) violation, however, there is a genuine dispute whether the particular interaction between Davison and Ann Maiatico fully complied with Rules 1.7(b) and (c) and 1.13, including the required full disclosure to Griva and her consent to the representation—requirements to which we now turn.

### B. *Full Disclosure and Consent*

 Comment [12] to Rule 1.7 describes the required disclosure:

Adequate disclosure requires such disclosure of the parties and their interests and positions as to enable each potential client to make a fully informed decision as to whether to proceed with the contemplated representation. If a lawyer's obligation to one or another client . . . precludes making such full disclosure to all affected parties, that fact alone precludes undertaking the representation at issue. Full disclosure also requires that clients be made aware of the possible extra expense, inconvenience, and other disadvantages that may arise if an actual conflict of position should later arise and the lawyer be required to terminate the representation.

---

18. We note that in a report dated December 8, 1993, a Committee of the District of Columbia Bar has proposed various amendments to this court's Rules of Professional Conduct, including extensive revisions and clarifications of Rule 1.7. *See* Proposed Amendments to the District of Columbia Rules of Professional Conduct, Report to the Board of Governors of the District of Columbia Bar, District of Columbia Bar Rules of Professional Conduct Review Committee, at 16 (Dec. 8, 1993). The Board of Governors of the Bar has published the proposed amendments for comment. Neither the Board of Governors nor this court has yet considered these proposals.

D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. [12]. Comment [13] adds that disclosure does not have to be in writing. Similarly, this court has defined full disclosure for purposes of the Code. In *In re James*, 452 A.2d 163, 167 (D.C.1982), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983), we said, referring to DR 5–104(A):

> "Full disclosure" includes a clear explanation of the differing interests involved in the transaction and the advantages of seeking independent legal advice. It also requires a detailed explanation of the risks and disadvantages to the client entailed in the agreement, including any liabilities that will or may forseeably accrue to him.

After full disclosure of the differing interests, all potentially affected clients must consent to the representation. The Terminology section of the Rules defines "consent" as "a client's uncoerced assent to a proposed course of action, following consultation with the lawyer regarding the matter in question." D.C.App.R.X, app. A, Terminology at 1531 (1993). The Code did not contain a definition of "consent," but we believe the definition of "consent" we have quoted from the Rules reflects a commonly understood meaning that is properly applicable to conduct occurring before January 1, 1991, and thus governed by the Code.

David & Hagner argues that Griva's undisputed discussion with her attorney regarding her concerns about David & Hagner representing the partnership constituted an acceptable form of disclosure. They further argue that her acknowledgement in her deposition that she "anticipated that David & Hagner would represent the [MFLP]," and thus that she "didn't bother to do anything about it," constituted implied consent from the beginning of MFLP, which satisfied the requirement of Rule 1.7(c). Finally, David & Hagner contends that Griva could not effectively withdraw her implied consent to their continued representation of MFLP and the Maiaticos because the partnership agreement required unanimous partner consent to change general counsel and the Maiaticos would not agree. Thus, the lawyers say,

there is no genuine issue of material fact as to whether Griva gave her fully informed consent to the dual representation.

■■■ We cannot agree that Griva's independent consultation with her own attorney regarding David & Hagner's representation of the partnership is sufficient to satisfy David & Hagner's duty to supply full disclosure. Where dual representation creates a potential conflict of interest, the burden is on the attorney involved in the dual representation to approach both clients with an affirmative disclosure so that each can evaluate the potential conflict and decide whether or not to consent to continued dual employment. *See International Business Machs. Corp. v. Levin*, 579 F.2d 271, 280 (3d Cir.1978) (to adhere to high standards of professional responsibility, attorney must resolve all doubts in favor of full disclosure to client of facts of dual representation under DR 5–105); *Florida Ins. Guar. Ass'n v. Carey Canada, Inc.*, 749 F.Supp. 255, 258–60 (S.D.Fla.1990) (letter by insured's law firm to inform claims adjuster for Florida Insurance Guaranty Association of potential conflict of interest was inadequate disclosure under Rule 1.7); *In re Hansen*, 586 P.2d 413, 415 (Utah 1978) (under DR 5–105, burden is on attorney to show he or she made full disclosure and obtained client's consent). The record to date does not reflect that this was done here.

■■■ Furthermore, the fact that Griva did not contest her siblings' decision to have David & Hagner organize the partnership and represent MFLP thereafter in transactions with outside parties cannot constitute "consent" to whatever dual representation eventually occurred. *See Kearns v. Chrysler Corp.*, 771 F.Supp. 190, 192 (E.D.Mich.1991) (plaintiff's failure to seek to disqualify defendant's counsel did not show plaintiff's consent to defendant's counsel where plaintiff never specifically approved of agreement allowing defense counsel's representation). Although Griva's inaction may have satisfied MFLP's unanimous consent requirement (if there was one) for retaining a general counsel [19]—an

---

19. Griva stated in her deposition that she thought that "the partnership had to [have]

unanimous consent on business decisions and not [in deciding] whether or not there would be

issue we do not decide—her inaction was not necessarily sufficient to constitute consent to David & Hagner's dual representation of MFLP and the Maiaticos if it came to present a serious conflict of interest. *See Avianca, Inc. v. Corriea,* 705 F.Supp. 666, 679–80 (D.D.C.1989) (attorney providing dual representation violated Disciplinary Rules by not seeking informed consent of clients involved). There is a genuine issue of material fact, therefore, as to whether David & Hagner (including Davison) sought and obtained Griva's affirmative consent to its dual representation of MFLP and the Maiaticos pursuant to Rules 1.7(a) and (b).

■ Finally, even if Griva did consent at some point to David & Hagner's dual representation of MFLP and of the Maiaticos, we cannot agree with David & Hagner, as a matter of law, that Griva could not later withdraw that consent. When the partners formed MFLP, there were no actual conflicts between MFLP and its individual partners. However, we are aware of no authority that would compel us to hold that, upon one partner's consent to a lawyer's dual representation of the partnership and of several other individual partners, all consenting parties are bound to their agreement even when actual conflicts arise.[20]

### C. *Remedies Available for Code/Rules Violations*

Griva seeks declaratory judgments that defendant-appellees breached their fiduciary duties and that MFLP no longer can retain David & Hagner as its legal counsel. She also seeks an injunction to prevent defen-

dants from barring her access to David & Hagner's files relating to the firm's representation of Ann and Michael Maiatico in MFLP matters. We must consider, therefore, whether such remedies would be appropriate for violations of the Code of Professional Responsibility or the Rules of Professional Conduct.

According to the "Scope" section of the rules:

Violation of a Rule does not necessarily give rise to a cause of action, nor does it create a presumption that a legal duty has been violated. Some violations may be subject to redress only through the disciplinary process, and other violations may be relevant to liability only to a client of the lawyer who commits the violation. In appropriate cases, violation of a Rule may be evidence admissible in connection with a claim that a substantive duty has been violated, but in other cases evidence of such violations may not be admissible on the issue of the liability of the lawyer to others. Such issues are to be resolved by the tribunal having jurisdiction with respect to the substantive claims.

D.C.App.R.X., app. A, Scope at 152. The Code of Professional Responsibility did not contain language similar to the above-quoted provision from the "Scope" section of the rules.

■ Despite these cautious statements in the "Scope" section of the rules and the absence of similar language in the Code, case law confirms that a violation of the Code of Professional Responsibility or of the Rules of

---

an attorney." She further stated that she thought that only a majority of the partners was required to decide on an attorney.

20. Griva contends that because of MFLP's unanimous consent provision, "the MFLP cannot retain [David & Hagner] as legal counsel to the MFLP in any matter" without her consent—irrespective of whether David & Hagner violated ethical rules regarding conflicts of interest. She argues that the partners never voted unanimously "to retain David & Hagner for all time and in all matters" and that "unwanted representation cannot be forced on a dissenting partner." Griva argues that McDaniel's September 30, 1991 letter to Davison had the effect of withdrawing her consent to David & Hagner's representation of MFLP. Appellees contend, on the other hand,

that "(1) the decision to retain David & Hagner as general counsel to the MFLP was made unanimously, and (2) a unanimous decision to terminate David & Hagner's engagement as general counsel to the MFLP has not been made." We do not decide the legal effect, if any, of McDaniel's September 30, 1991 letter to Davison, withdrawing Griva's consent to David & Hagner's representation of MFLP. We note, however, that if, at trial, the fact-finder determines that David & Hagner did not violate any ethical rule, and, therefore, cannot be discharged for that reason, Griva has preserved her argument, based on MFLP's unanimous consent requirement, that David & Hagner no longer may serve as MFLP's counsel.

Professional Conduct can constitute a breach of the attorney's common law fiduciary duty to the client. For example, in *Avianca*, the court explained that the Code of Professional Responsibility,

> while not strictly providing a basis for a civil action, nevertheless may be considered to define the minimum level of professional conduct required of an attorney, such that a violation of one of the DRs is conclusive evidence of a breach of the attorney's common law fiduciary obligations.

705 F.Supp. at 679 (citation omitted). Other courts have agreed, holding that appropriate sanctions for violation of the Code include attorney disqualification, *see International Business Machs. Corp.*, 579 F.2d at 283; *Harte Biltmore Ltd. v. First Pennsylvania Bank*, 655 F.Supp. 419, 421 (S.D.Fla.1987); *Derrickson v. Derrickson*, 541 A.2d 149, 152 (D.C.1988), as well as a refund of attorney's fees to the injured client, *see Jeffry v. Pounds*, 67 Cal.App.3d 6, 136 Cal.Rptr. 373, 377 (1977); *In re Hansen*, 586 P.2d at 417.

The parties cite no case in which a court ordered a lawyer to disclose information to a client who had been adversely affected by the lawyer's violation of the rules regarding conflicts of interest. As indicated earlier, comment [8] under Rule 1.13 provides that, when "the organization's interest may be or become adverse to those of one or more of its constituents," "discussions between the lawyer for the organization and the individual [constituent] may not be privileged." D.C. RULES OF PROFESSIONAL CONDUCT Rule 1.13 cmt. [8]. If, at trial, an ethical violation is found and the trial court determines that Griva ordinarily would be entitled to access to David & Hagner's files concerning its representation of the Maiaticos on MFLP matters, the trial court will have to resolve whether Ann and Michael Maiatico can invoke the attorney-client privilege to prevent David & Hagner from turning those files over to Griva.

In *Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 240 U.S.App.D.C. 88, 93–94, 743 F.2d 932, 937–38 (1984), the United States Court of Appeals for the District of Columbia Circuit offered guidance relevant here. Eureka, the owner of real estate in the District of Columbia, announced its intention to convert one of its buildings into condominiums. Eureka's tenants opposed the conversion, relying on Section 602 of the Rental Housing Act of 1977. Eureka's insurance policy with Chicago Title Insurance Company (CTI) specifically covered Eureka for costs involved in defending against tenants relying on Section 602 of the Rental Housing Act of 1977. Eureka and CTI therefore combined efforts to defend against Eureka's tenants. In this dispute, Eureka and CTI were jointly represented by a member of the firm of Fried, Frank, Harris, Shriver & Kampelman (Fried, Frank), which had previously handled many other matters for Eureka. Eureka ultimately entered into a settlement agreement with the tenants, without CTI's consent. Eureka then brought suit against CTI, claiming, under its CTI insurance policy, the cost of its settlement with the tenants, delay damages, and attorney's fees. Eureka prevailed in the trial court, and CTI appealed, arguing, *inter alia*, that the trial court had erred in denying CTI discovery of certain documents which would have shown that Eureka breached its duty of cooperation with CTI under the policy. The trial court had denied discovery of the documents on the basis of Eureka's attorney-client privilege.

According to Eureka's brief, Fried, Frank had "represented CTI and Eureka *jointly* with respect to the defense of the tenant . . . actions" and had "represented Eureka *individually* with respect to the conversion [of the condominiums] generally and Eureka's rights *vis-a-vis* CTI." *Id.* at 92, 743 F.2d at 936. CTI and Eureka each contended that one of two principles from Wigmore's discussion of attorney-client privilege applied to the situation. CTI advocated Wigmore's first principle:

> [A] communication by A to X as the common attorney of A and B, who afterwards become party opponents, is not privileged as between A and B since there was no secrecy between them at the time of communication.

8 J. WIGMORE, EVIDENCE § 2312 at 605–06 (McNaughton rev. ed. 1961). Eureka contended, to the contrary—and the court

agreed—that Wigmore's third principle applied:

A communication by A to X as A's attorney, X being then also the attorney of B, now become the party opponent, is ordinarily privileged because of the relation of X toward A. Nor does the fact of A's knowledge that X is already B's attorney, nor the fact of B's being already adversely interested destroy the privilege. This is so because, although X ought not to undertake to act for both in any matter where there is a possibility of adverse interests, nonetheless A is protected by reason of the relation.

8 J. WIGMORE, EVIDENCE § 2312 at 608 (McNaughton rev. ed. 1961). The court concluded that Wigmore's third principle applied because "[t]he policy behind Wigmore's first principle—to encourage openness and cooperation between joint clients—does not apply to matters known at the time of communication not to be in the common interest of the attorney's two clients." *Eureka,* 240 U.S.App.D.C. at 93, 743 F.2d at 937. The court stated that "[t]he communications sought here were made not only after the interests of CTI and Eureka diverged but after their common attorney knew they diverged and undertook separate representation of Eureka on this understanding." *Id.*[21]

We do not decide how, if at all, *Eureka* and Wigmore's two principles apply to this case. We have identified and summarized them merely for the trial court's use after remand.

In sum, we cannot decide as a matter of law on this record whether David & Hagner or Davison violated the Code of Professional Responsibility or the Rules of Professional Conduct and, as a consequence, breached their fiduciary duties to Griva. Genuine issues of material fact must be resolved at trial before the question whether these were such violations can be answered. We have shown, however, that in the event such violations are proved, there is precedent for their serving as the basis for civil liability. We leave to the trial court the question of the appropriate forms of relief in the event that David & Hagner or Davison is found to have breached fiduciary duties.

## IV.

 Claim two of Griva's complaint requests a declaratory judgment that defendants conspired to breach their fiduciary duties. The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. *See Halberstam v. Welch,* 227 U.S.App.D.C. 167, 172, 705 F.2d 472, 477 (1983). In addition, civil conspiracy depends on the performance of some underlying tortious act. It is thus not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort. *Id.* at 174, 705 F.2d at 479. Griva contends that her claim for breach of fiducia-

---

**21.** *Compare Truck Ins. Exch. v. St. Paul Fire & Marine Ins. Co.,* 66 F.R.D. 129 (E.D.Pa.1975). In this case, Truck Insurance Exchange (Truck), had defended the insured, American Security, in a personal injury action and had paid the amount of the settlement to the plaintiff in that case. Truck then brought suit against St. Paul for indemnity, alleging that St. Paul had essentially promised to indemnify American Security in this situation. In defending against Truck, St. Paul sought the file and deposition of Truck's attorney, who had represented Truck and American Security in the personal injury action. Truck claimed that the information sought by St. Paul was protected by the attorney-client privilege. The court disagreed with Truck and concluded that the attorney-client privilege did not protect Truck's attorney communications in this situation. The court stated:

Truck ... is claiming that the defendant, St. Paul, was the insurer of American Security in the underlying lawsuit and that since it was acting on behalf of St. Paul [in representing American Security in that lawsuit], Truck Insurance Exchange has a right to recover whatever it paid on behalf of St. Paul. If [Truck is] correct ... the attorney who defended the underlying action ... was the attorney representing both the plaintiff, Truck Insurance Exchange, and the defendant, St. Paul. Therefore, neither client can claim the attorney-client privilege when waived by the other and the privilege is inapplicable to the facts of this case.

*Id.* at 133.

ry duty is the underlying tortious act, and thus that summary judgment should not have been granted in defendants' favor.

 Appellees respond that "Griva failed to allege or offer any evidence of two essential elements of the cause of action, agreement and actual injury." We agree that Griva has not successfully alleged a civil conspiracy. Griva does not allege any agreement, and she does not claim actual damages; she merely seeks nominal damages of $1. The trial court, therefore, correctly entered summary judgment on claim two in appellees' favor.

### V.

We affirm the trial court's grant of summary judgment in favor of appellees on claim two. We reverse as to claims one, three, and four, and remand for trial.

*So Ordered.*