# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 8, 2011          Decided January 20, 2012

No. 10-7071

KEVIN SO,
APPELLEE

v.

LEONARD J. SUCHANEK, ESQUIRE,
APPELLANT

---

Consolidated with 10-7087 and 10-7113

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cv-02091)

---

*Jason H. Ehrenberg* argued the cause for appellant/cross-appellee. With him on the briefs was *James C. Bailey*. *Brian Shaughnessy* entered an appearance.

*David G. Tripp* argued the cause and filed the briefs for appellee/cross-appellant.

Before: HENDERSON, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: This case is here on appeal and cross-appeal from the judgment of the district court ordering attorney Leonard Suchanek to pay his former client Kevin So $455,933.52, an amount representing a portion of the legal fees Suchanek collected from So, plus interest.

So is a citizen of the People's Republic of China, a resident of Hong Kong, and the general manager of his family's cosmetics company. He does not speak, read, or write English. So met Lucy Yan Lu in 2004 through a business partner. Convinced of Lu's expertise, So granted her written authorization to serve as his agent in investment matters. In April 2005 Lu signed an agreement between So and Land Base, LLC, a California entity operated by Boris Lopatin. The agreement called for Land Base to make investments on So's behalf, and periodically to disburse to him fifty percent of any profits. Pursuant to the agreement, So transferred $30 million to a HSBC Bank account in London, England. An "Irrevocable Bank Instruction" appended to the agreement called for the funds to be administered by 5th Avenue Partners Ltd., a Land Base affiliate controlled by Michael Brown.

The investment initially appeared to be a success. So received nearly $3 million in profits between May and August of 2005. These "profits" turned out to be fictitious. As HSBC later discovered, Brown had been running a Ponzi scheme. So first learned this in early 2006. By that time, his $30 million investment had disappeared and HSBC had brought suit in London against Brown, Lu, So, and others seeking to absolve itself of any responsibility for the loss. HSBC alleged that the bank instruction was fraudulent; that Brown had used it to mislead So into thinking his deposit was secure; and that Land

Base's agreement with So was "designed to lend an appearance of legitimacy to arrangements made for the purpose of money laundering or some other unlawful purpose."

Early in the litigation, Lopatin – who ran Land Base – referred Lu to Leonard Suchanek, a former administrative law judge with an office in Washington, D.C. Lu met with Suchanek in July 2006 and hired him to assist in recovering So's funds. She explained to So, through an intermediary, that Suchanek was a "very powerful U.S. judge" who was willing to help them "without any service fee." Lopatin provided a resume listing Suchanek's title as "Chief Judge Emeritus" of the "U.S. Federal Special Contract Court . . . U.S. General Services Administration." (Suchanek had served as Chief Judge of the General Services Administration Board of Contract Appeals; he resigned in 1992 and entered private practice.)

Suchanek began representing Lu and So in July 2006 despite the fact that he was already representing Land Base in connection with the HSBC suit. While Suchanek was simultaneously representing Lu, So, and Land Base, he prepared a twelve-page legal opinion on Land Base's behalf. The opinion concluded that Land Base's agreements with So and other investors did not facilitate an "illegal scheme," and that any claim to the contrary was "frivolous." Suchanek terminated his representation of Land Base on August 24, 2006. He then sent an engagement letter to Lu and So on September 10, 2006, confirming that the representation had begun in July and that its scope included "obtaining compensation and damages due as the result of any wrong-doing against you that has been committed by any person, firm, [or] company." So paid Suchanek $99,000 shortly after receiving the letter.

Suchanek coordinated what he described as a "complex worldwide litigation" campaign on So's behalf. In this role,

Suchanek served primarily as an administrator. He hired counsel to represent So in London, Hong Kong, New York, and several other jurisdictions, and managed So's communication with these firms, but did not appear in court on So's behalf. Suchanek also oversaw the campaign's finances, including payment of the various law firms and processing of sums recovered by them in the HSBC litigation – all through a trust account he maintained for So. In August 2007, Suchanek instructed So to wire $2.1 million to this account for litigation expenses.[1] So expressed reservations about the cost, describing it as "so much higher than my budget," but complied after Suchanek assured him a "minimum recovery" of $160 million.

So began to lose trust in Lu, his agent, just a few months into the joint representation. In December 2006, he informed Suchanek that Lu had attempted to fire Kendall Freeman, the law firm representing them in London, without his consent. And in February 2007, So complained that Lu had lied to Suchanek about So's willingness to pay for her share of the legal fees. These developments led So to contemplate cancelling Lu's authority to act as his agent. Suchanek encouraged So to "keep the status with [Lu] the same" despite her actions. He attempted to hold the relationship together by maintaining – or at least purporting to maintain – separate, confidential correspondence with Lu and So. The effort fell apart, however, when So notified Suchanek that Lu had falsified a witness statement bearing his name in August 2007 (the statement was prepared for use in the HSBC litigation). Suchanek responded by urging So to cut off Lu's authority, but continued to represent Lu and So jointly until January 31, 2008, when Suchanek terminated his representation of So.

---

[1] Suchanek represented – as it turns out, falsely – that none of these funds would be used to pay for his services. Suchanek never sent So an invoice at any point in the representation.

At the conclusion of the representation, Suchanek held back $400,000 of the funds remaining in So's trust account for his "invoice." So objected, demanding that Suchanek remit the withheld funds to him and provide a full accounting. When Suchanek refused, So filed suit for malpractice, breach of contract, breach of fiduciary duty, and replevin.

The district court conducted a bench trial and eventually winnowed the case down to a single claim for breach of fiduciary duty. On that claim, the court held that Suchanek had violated the District of Columbia Rules of Professional Conduct governing conflicts of interest – and thus breached his fiduciary duty to So – during two distinct periods. The first involved Suchanek's simultaneous representation of So and Land Base in July and August of 2006. The second arose from Suchanek's continued representation of Lu and So after August 21, 2007, when So reported that Lu had falsified his witness statement. To remedy these breaches, the court ordered Suchanek to disgorge $400,000 plus interest, for a total of $455,933.52. The court reasoned that this amount was roughly equal to the sum Suchanek collected "during the two conflicted periods."

Suchanek seeks to have the judgment reversed. So's cross appeal seeks disgorgement of the rest of the approximately $1 million Suchanek covertly paid himself over the course of the representation. While the case was pending on appeal, So moved to have the $320,100.92 remaining in his client trust account[2] turned over to him "in partial satisfaction of the Judgment." Suchanek responded by moving to stay enforcement of the judgment pending disposition of the appeal. The district court denied the motions. In doing so, it ordered

---

[2] These funds are a subset of the $400,000 initially held back by Suchanek as payment for his services, the remainder having been spent by Suchanek.

Suchanek to transfer So's trust funds to the district court's registry, stayed execution of the judgment to the extent of the amount transferred, and permitted Suchanek to post a supersedeas bond for the remainder. Suchanek has also appealed this ruling.

I

Suchanek denies that he breached his fiduciary duty to So. Under District of Columbia law,[3] a violation of the Rules of Professional Conduct "can constitute a breach of the attorney's common law fiduciary duty to the client." *Griva v. Davison*, 637 A.2d 830, 846-47 (D.C. 1994). Although not every ethics violation rises to the level of a breach of fiduciary duty, *Television Capital Corp. of Mobile v. Paxson Commc'ns Corp.*, 894 A.2d 461, 469 (D.C. 2006), a breach occurs "when an attorney represents clients with conflicting interests," *Hendry v. Pelland*, 73 F.3d 397, 401 (D.C. Cir. 1996).

Rule 1.7 provides the general rule governing conflicts. D.C. RULES OF PROF'L CONDUCT R. 1.7. It states, in relevant part, that a lawyer may not represent a client when the representation "will be or is likely to be adversely affected by representation of another client." *Id.* R. 1.7(b)(2). This prohibition is conditional, and ceases to apply when two criteria are satisfied. *See id.* R. 1.7(c). First, each of the affected clients must provide informed consent "after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of [the joint] representation." *Id.* R. 1.7(c)(1). Second, the lawyer must "reasonably believe[]" that he "will be able to provide competent and diligent representation to each affected client."

---

[3] The events in this case took place on three continents, but the parties agree that District of Columbia law governed Suchanek's representation of So.

*Id.* R. 1.7(c)(2). "The underlying premise" of these restrictions "is that disclosure and informed consent are required [whenever] . . . there is any reason to doubt the lawyer's ability to provide wholehearted and zealous representation . . .." *Id.* R. 1.7 cmt. 7. Thus, "if an objective observer would have any reasonable doubt on that issue, the client has a right to disclosure of all relevant considerations and the opportunity to be the judge of its own interests." *Id.*

The district court correctly held that Suchanek violated Rule 1.7 by simultaneously representing So and Land Base in July and August of 2006. During that period, Suchanek never advised So that he might have claims against Land Base. Yet So's agreement with Land Base was a but-for cause of So's loss, and the Land Base agreement made certain warranties against any loss to the $30 million So initially deposited in the HSBC account. As the district court found, "Suchanek could not have advised So to pursue his warranty claims against Land Base . . . without violating his obligations to Land Base."

Suchanek also prepared the Land Base opinion while he was representing Land Base and So. The opinion, which was filed as an attachment to Lopatin's witness statement in the HSBC litigation, undercut any claims So might have had against Land Base by concluding that the Land Base agreements did not facilitate an unlawful scheme. *See* D.C. RULES OF PROF'L CONDUCT R. 1.7 cmt. 13 (stating that a conflict exists when "there is a significant risk that a lawyer's action on behalf of one client . . . will adversely affect the lawyer's effectiveness in representing another"). Under these circumstances, Suchanek's representation of Land Base clearly compromised his representation of So. *See id.* R. 1.7(b)(2). And, because Suchanek could not have "reasonably believe[d]" that he was capable of "provid[ing] competent and diligent representation to each affected client," he breached his fiduciary duty to So. *Id.*

R. 1.7(c)(2); *see also Hendry*, 73 F.3d at 401 (describing lawyers' duty of "undivided loyalty" to clients).

The district court's analysis of the second conflict period, between August 2007 and January 2008, is also sound. Before August 2007, So regularly informed Suchanek that Lu was undermining him, often by acting outside the scope of her authorization. *See infra* Part II. Then, on August 21, 2007, So notified Suchanek that Lu had falsified a witness statement bearing his name. These developments would have caused an objective observer to doubt whether Suchanek could continue to "wholeheartedly and zealously" represent both So and Lu. D.C. RULES OF PROF'L CONDUCT R. 1.7 cmt. 7; *see also id.* cmt. 14 (joint representation "improper when it is unlikely that impartiality can be maintained"). Suchanek recognized the gravity of Lu's transgression, describing it as "very serious," and even recommended that So immediately terminate Lu's authority to act on his behalf. He also told So that a court order issued in the HSBC litigation was "based upon misrepresentations by [Lu]." Yet he continued the joint representation, without making any effort to secure So's informed consent, in clear contravention of his ethical and fiduciary duties. *See id.* R. 1.7(b)(2), (c); *Hendry*, 73 F.3d at 401; *Griva*, 637 A.2d at 845 (informed consent required whenever "dual representation creates a *potential* conflict of interest" (emphasis added)).

Suchanek's remaining argument concerns the district court's post-trial ruling. His brief contends that the district court erred "in denying Suchanek's post-judgment Motion to Stay, granting in part So's post-judgment turnover motion,[4] and

---

[4] This is not accurate – the district court did not grant, in whole or in part, So's turnover motion. The order states in bold text that the motion was denied.

ordering Suchanek to deposit the sum of $320,100.92 into the Court's registry." Suchanek's basic point is that So's cross-appeal automatically superseded the judgment – thus vitiating any duty Suchanek had to post an appellate bond.

In *Price v. Franklin Investment Co.*, 574 F.2d 594, 597 (D.C. Cir. 1978), we held that "a litigant may not accept all or a substantial part of the benefit of a judgment and subsequently challenge the unfavorable aspects of that judgment on appeal." When a judgment contains "separable or divisible" parts, however, a "firmly established exception" to the rule allows a prevailing party to "accept the benefit of the separable or divisible feature in his favor and challenge the feature adverse to him." *Id.* (quoting *Luther v. United States*, 225 F.2d 495, 497 (10th Cir. 1954)). The judgment in this case falls within the exception. It consisted of two divisible parts: one favorable to So (disgorgement of fees collected during two parts of the representation), another not (denial of So's disgorgement request with respect to the rest of the representation). So's cross-appeal focuses exclusively on the latter, and seeks only *additional* damages. *See BASF Corp. v. Old World Trading Co.*, 979 F.2d 615, 616 (7th Cir. 1992); *Price*, 574 F.2d at 597.

Suchanek had a choice: he could face execution of the judgment or post a bond to suspend its effect. *See* FED. R. CIV. P. 62(d) ("If an appeal is taken, the appellant may obtain a stay by supersedeas bond . . .."). The choice was particularly stark with respect to the $320,100.92 held by Suchanek in So's trust account.[5] Suchanek opted not to release the funds to So, and did not post a supersedeas bond. Under those circumstances, the

---

[5] We are unsure whether these funds, which appear to be So's property, can be used to satisfy a judgment against Suchanek. In light of our decision in Part II below, we leave it to the district court to decide the question.

district court had broad discretion to determine the type of security needed. *See, e.g.*, *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). The court's order requiring Suchanek to deposit the trust funds in the registry was proper in light of Suchanek's history of moving So's money, without authorization, into other bank accounts – sometimes spending it rather than returning it to So or to So's trust account.

For these reasons, we affirm the rulings below as they pertain to Suchanek's appeal.

II

On cross-appeal, So contends that the district court erred in ordering disgorgement of only some of the fees Suchanek collected. Total disgorgement is required, So maintains, because Suchanek's conflicts of interest were not limited to the two periods identified by the district court. Instead, they persisted throughout the representation, from start to finish. The sources of these conflicts included Suchanek's personal interests, those of his assistant, Mira Meltzer, and Suchanek's representation of several other parties involved in the HSBC litigation.

Disgorgement is an equitable remedy entrusted to the sound discretion of the district court. *See United States v. Nacchio*, 573 F.3d 1062, 1080 (10th Cir. 2009); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1096 (7th Cir. 1994). "A district court by definition abuses its discretion when it makes an error of law."[6] *Teachey v. Carver*, 736 A.2d 998, 1004 (D.C. 1999)

---

[6] This statement implies that courts have discretion in deciding pure questions of law. Of course, they do not. The import of the rule, which does not line up precisely with its text, is that a discretionary

(quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). Here, the district court misapplied Rule 1.7 – and thus abused its discretion – when it held that Suchanek had a conflict of interest only during the two periods described above.

Suchanek's joint representation of Lu and So is illustrative in this regard. The only ethics expert to testify at trial opined that the representation was conflicted from the outset because So had potential claims against Lu, based on her decision to sign the Land Base agreement on So's behalf. Suchanek claims that he did not initially perceive a conflict between Lu and So, but we are not concerned with his subjective impressions. Under Rule 1.7, the question is whether there was "any reason to doubt [Suchanek's] ability to provide wholehearted and zealous representation" to both Lu and So. D.C. RULES OF PROF'L CONDUCT R. 1.7 cmt. 7. This depends on whether an objective observer – with Suchanek's prior knowledge of Lopatin, Land Base, and the particulars of the fraudulent scheme – would have had a "reasonable doubt" of his ability to represent jointly a victim of the scheme and the person who got him involved in it in the first place. *See id.* The answer, we think, is clearly yes.

These doubts would have grown even more substantial as the representation progressed. In August 2006, Suchanek learned that Kendall Freeman attorneys had accused Lu of destroying critical evidence. Suchanek prepared Lu's response to these allegations. Later in 2006, So informed Suchanek that Lu had lied to Suchanek about the division of attorneys fees, falsely claiming that So had agreed to pay her share. So also indicated that Lu had attempted to fire the Kendall Freeman firm without his, So's, consent. Similar disputes between Lu and So

---

ruling is subject to reversal *when it is founded on an erroneous view of the law*.

continued through mid-2007, as So accused Lu of repeatedly exceeding her authorization to act on his behalf.

Suchanek was fully aware of these problems. Meltzer, who prepared, read, and sent all of Suchanek's correspondence (Suchanek is blind), explained at trial that So's complaints made it impossible to tell whether Lu remained So's agent. Rather than addressing these issues through the informed consent process contemplated by Rule 1.7(c), Suchanek attempted to assuage So's concerns by telling him their communications were secret and would not be disclosed to Lu. The commentary accompanying Rule 1.7 makes clear that joint representation "will almost certainly be inadequate" when such confidences are necessary. *Id.* R. 1.7 cmt. 16.

These considerations would have put any reasonable attorney on notice that a conflict existed between Lu and So well before August 21, 2007 – the date the district court identified as the start of the second conflict period. *See id.* R. 1.7 cmt. 7; *see also Griva*, 637 A.2d at 845. The district court's error in assessing the conflict between Lu and So influenced the scope of the remedy it selected. In ordering Suchanek to disgorge $400,000 plus interest, the court used the amount Suchanek paid himself "during the two conflicted periods" as a guide. It follows that the court would have awarded a larger sum if it had (correctly) found a conflict during other parts of the representation.

We will therefore remand the case to the district court for further review of the record and issuance of a supplemental remedy, greater than the amount already ordered. On remand, the district court should consider the conflict between Lu and So, as well as the variety of other serious conflicts of interest

alleged in So's brief.[7]  The remedy it fashions should account for the full extent of the conflicts found; the need to deter attorney misconduct; the "fundamental principle of equity . . . that fiduciaries should not profit from their disloyalty"; and the decreased value of the services provided to So resulting from Suchanek's rampant misconduct.  *Hendry*, 73 F.3d at 402; *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 37 cmt. e (2000) ("Ordinarily, forfeiture extends to all fees for the matter for which the lawyer was retained . . ..").

*So ordered.*

---

[7] We do not reach these additional claims.  The district court need not receive further evidence when addressing them since the record is already well-developed.